UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA : **07 CR. 840 (PAC)**

- v - :

GEORGE MYLES, :

:

Defendant.

:
-----------------------------------------------------X

**DEFENDANT GEORGE MYLES' MOTION AND MEMORANDUM IN SUPPORT THEREOF TO TRANSFER VENUE**

LEONARD F. JOY
**DAVID E. PATTON**
The Legal Aid Society
Federal Defender Division
Attorney for **GEORGE MYLES**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8762

TO: **MICHAEL GARCIA, ESQ.**
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
Attn.: **CHRISTOPHER LAVIGNE, ESQ.**
Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA : **07 CR. 840 (PAC)**

- v - :

GEORGE MYLES, :

:

Defendant.

:
-----------------------------------------------------X

**DEFENDANT GEORGE MYLES' MOTION AND MEMORANDUM IN SUPPORT THEREOF TO TRANSFER VENUE**

**INTRODUCTION**

Defendant George Myles hereby moves under Federal Rule of Criminal Procedure 21(b) to transfer this case to the Southern District of Florida.

The Government alleges that between April 2005 and March 2007, Mr. Myles operated a business in Pompano Beach, Florida, which sold spare aircraft parts to Spain, Thailand and the United Arab Emirates in violation of the Arms Export Control Act ("AECA"). The Indictment also alleges that Mr. Myles committed mail fraud by falsely under-reporting the value of the items shipped abroad[1] and money laundering by receiving payment for the sale of the spare parts from a third party so as to disguise the origin of the proceeds.

[1] Presumably, though it is not clear from the face of the Indictment, the victims of the fraud are the customs agencies of the countries to which the parts were sent.

From the Indictment and the Complaint, it appears that the Government's only basis for claiming venue in the Southern District of New York is that the payments made by Mr. Myles' overseas customers, which were wire transferred to Miles Aviation's bank account in Florida, were cleared through the Federal Reserve Bank of New York. Neither charging document claims that Mr. Myles ever conducted any sort of business in New York, much less business that is related to the charges.

Indeed, as more fully explained below, Mr. Myles has never conducted business in New York. In fact, he has spent virtually his entire adult life in Florida and has never lived or spent any appreciable amount of time in New York. The events at issue here all took place in Florida and overseas. This case has nothing to do with New York, and it should be transferred to the Southern District of Florida.

## FACTUAL BACKGROUND

Mr. Myles was born and raised in Augusta, Georgia, and upon graduating high school, he attended Morris Brown College in Atlanta, Georgia. (See Myles Affidavit, attached hereto as Exhibit A). In 1970, he was drafted by the Miami Dolphins of the National Football League where he played defensive end. (Id. at ¶ 4). In 1971, he was drafted into the United States Army and attended Officer Candidate School in Milledgeville, Georgia where he graduated in 1973 as a Second Lieutenant. (Id. at ¶ 5). Between 1970 and 1973, he was stationed at various times in Korea, Panama, Louisiana and Georgia. (Id.). In 1973, he left the Army and became a member of the Florida National Guard Reserves where he served for the next 20 years, eventually retiring at the rank of Captain. (Id.)

After leaving the Army, he began working for Sears, Roebuck in their management training program. (Id. at ¶ 7). He spent three years with Sears in Atlanta, Georgia before being briefly transferred to Chattanooga, Tennessee. (Id.). In 1978, he transferred to Miami, Florida where he continued to work until his retirement from Sears in 1991. (Id. at ¶ 8).

Since 1991, he has continued to reside in Florida, and has at various times been a City Commissioner in the town of Lauderhill, Florida, worked for a company called Daytona Aerospace, and operated his own businesses, including Miles Aviation where he employed eight full-time employees. (Id. at ¶ 9).

During his time in Florida, he married and raised a family. He has now been married for over 35 years and has three daughters who all reside in Florida. (Id. at ¶ 10). One daughter attends the University of Florida, another attends the University of Central Florida, and the third is an attorney with the Legal Aid Society in West Palm Beach. His wife teaches the sixth grade in Broward County. (Id.). His elderly mother and two siblings reside in Augusta, Georgia. (Id. at 11). His mother is in poor health as she suffers from diabetes, asthma, and high blood pressure. (Id.).

During his time in Florida, he has been active with numerous community service organizations. Among many other positions, he has served on the board of directors of his alma mater, Morris Brown College; been the Chairman of the Board of the Broward County Chapter of the Urban League; founded the Broward Chapter of the United Negro College Fund; served on the board of directors of the Girl Scouts of America in Broward County; and was on the national and local boards of directors for the National Conference for Christians and Jews, receiving their

National Brotherhood Award in 1994. (Id. at ¶ 12).

In March 2007, Mr. Myles was sentenced to 78 months imprisonment by the United States District Court in the Southern District of Florida for his conviction in November 2006 on charges of making false representations to purchasers of aircraft parts. (Id. at ¶ 13). The charges stemmed from my business activities as the owner of Miles Aviation, the same company whose activities are at issue in this case. (Id.). I am currently appealing that conviction and sentence in the United States Court of Appeals for the Eleventh Circuit. (Id.). My attorney in Florida filed a brief on my behalf on July 30, 2007, and we are awaiting oral argument. (Id.).

Following his conviction, he was designated by the Federal Bureau of Prisons to a Federal Prison Camp in Miami, Florida, as recommended by the district court, where his family, including his wife, children, mother, and siblings were able to visit him. (Id. at ¶ 14). Because of his mother's advanced age and his wife and daughters' financial constraints, his family is not able to visit him in New York. (Id. at ¶ 15). Since his transfer to New York in May 2007 for this case, he has not had a visit from his family. (Id.).

In connection with his business and community service activities for the past 40 years in the South Florida community, he has many former colleagues and associates who have expressed a willingness to support him in this case, and who may be called upon as witnesses to attest to his good character. (Id. at ¶ 16).

In addition to imposing obstacles in defending himself against the current charges, standing trial in the Southern District of New York would impose great emotional and financial hardship on Mr. Myles and his family. (Id. at ¶ 17).

**ARGUMENT**

Rule 21(b) of the Federal Rules of Criminal Procedure provides that: "Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice."

The venue provisions of the Federal Rules reflect long-standing principles of constitutional equity. As the Honorable John S. Martin noted: "It is well to remember ... that our forefathers included venue provisions in the Constitution in both Article III and the Sixth Amendment to ensure that citizens would not be dragged to distant places to stand trial." United States v. Ohran, 2000 WL 620217, at *1 (S.D.N.Y. May 12, 2000) (granting motion to transfer). The "historical principles underlying venue policy are fairness and justice generally." United States v. Aronoff, 463 F.Supp. 454, 457 (S.D.N.Y. 1978).

The Supreme Court has set forth ten factors that district courts should consider in assessing a motion to transfer under Rule 21(b): (1) the location of the defendants; (2) the location of possible witnesses; (3) the location of the events likely to be in issue; (4) the location of documents and records to be involved; (5) the disruption of defendants' business if the case is not transferred; (6) the expense to the parties; (7) the location of counsel; (8) the relative accessibility of the place of trial; (9) the docket condition of each district involved; and (10) any other special elements which might affect the transfer. See Platt v. Minn. Mining & Mfg. Co., 376 U.S. 240, 243-44 (1964).

The district court has broad discretion in balancing the equities and determining whether

to grant a transfer motion. See United States v. Maldonado-Rivera, 922 F.2d 934, 966 (2d Cir. 1990). The "basic question" to be answered by the district court is whether the transfer is "'in the interest of justice,' a determination which rests upon the unique facts of each case and is addressed to the Court's discretion." United States v. Alter, 81 F.R.D. 524, 526 (S.D.N.Y. 1979) (granting transfer to Florida), citing Platt, 376 U.S. at 245.

Here, almost all the Platt factors favor transfer, while none favor this district. The defendant has resided in Florida for virtually his entire adult life, the alleged events at issue occurred in Florida, and the business at issue and many potential witnesses are all located in Florida. While one of the factors is neutral here in assessing transfer -- disruption to the defendant's business -- none favor trial in New York.

The "nerve center" of this alleged conspiracy is located in Florida where Mr. Myles lived, ran his business, and allegedly engaged in the conduct at issue. See United States v. Hanley, 1995 WL 60019 at *3 (S.D.N.Y. Feb. 10, 1995) ("Where, as here, the 'nerve center' of events in issue occurred in another district, transfer has been found appropriate."). The sole connection to New York is the Government's claim that wire transfer payments from overseas passed through the Federal Reserve Bank of New York on their way to Mr. Myles's business bank account in Florida. Such a tenuous connection counsels against venue in New York.

This case, with its clear and strong nexus to Florida, should be transferred there for prosecution.

**1. The Location of the Defendant Favors a Transfer.**

The preference that defendants be tried in the state of their residence weighs heavily in

favor of transfer to Florida. As a "matter of policy...whenever possible, defendants should be tried where they reside." United States v. Russell, 582 F. Supp. 660, 662 (S.D.N.Y. 1984); see also United States v. Cashin, 281 F.2d 669, 675 (2d Cir. 1960). This consideration exists not only for the convenience of the defendants but, more importantly, for the policy preference that defendants should be tried by a jury of peers within their own community rather than those of an unfamiliar one. See Cashin, 281 F.2d at 675 (citing United States v. Johnson, 323 U.S. 273, 275 (1944)) (recognizing the "unfairness and hardship to which trial in an environment alien to the accused exposes him").

Here, Mr. Myles has been a Florida resident for most of his adult life, and he has no connection, personal or business, to New York. He has lived in Miami, with few exceptions, since he was drafted as a defensive end by the Miami Dolphins in 1970. After serving in the Army and working in Atlanta for Sears for several years, his connection with Florida resumed when Sears transferred him to Miami and where he served in the Florida National Guard Reserves. Since that time, he has had no other state of residence.

During his nearly three decades in Florida, Mr. Myles had become an active and well-respected member of the local community. His military service continued in the reserves until he retired as a Captain after twenty years of service. In addition to a full-time career at Sears and his several independent business ventures following his retirement, he has served on the board of directors of numerous community organizations, including Morris Brown College, the Urban League, the Girls Scouts of America, and the National Conference of Christians and Jews. He was also elected as a City Commissioner in Lauderhill, Florida and served from 1993 to 1998

and retired from politics after running for mayor and losing. These numerous commitments speak to the breadth and depth of his ties with the south Florida community.

His family connections are also in Florida and the surrounding areas. His wife, who is a sixth grade teacher, and three daughters, two of whom are college students and the third a Legal Aid attorney, all currently reside in Florida. Trips to Florida would impose a significant financial hardship for any of them, and as a result, despite their desire to do so, they have not been able to visit him in New York since his arrival here in May 2007.

His mother, brother and sister all reside in neighboring Georgia. His elderly mother has been in frail health, with high blood pressure, diabetes and asthma and consequently has not been able to visit Mr. Myles here in New York, a situation distressing to both her and Mr. Myles.

In contrast to his deep ties to Florida, Mr. Myles has no connection to New York. He has never lived in this state, nor does he have any relatives in this state. In Florida, he would be able to take comfort in his strong network of family, friends, and colleagues who would be able to support him; here he sits alone in pre-trial detention with no visitors. There, he can be given a trial by a jury of peers from his community; here he would face trial in an alien environment, with a jury less able to relate to his experiences and weigh his standing in the community. The policy considerations inherent in this factor weigh heavily in favor of transferring this case to the Southern District of Florida.

**2. Many, If Not All, of the Potential Witnesses are in Florida.**

The location of the potential witnesses impacts the effectiveness of the defense, since trial in a far-off jurisdiction poses substantial inconvenience to potential witnesses. United States v.

Alter, 81 F.R.D. 524, 527 (S.D.N.Y. 1979).  The availability and convenience of these witnesses, while not a controlling factor, is one that should be given considerable weight.  Russell, 582 F. Supp. 660, at 662. Such inconvenience may limit the number of witnesses a defendant is able to call on his behalf.  Id at 663.  As a practical matter, courts may compare the anticipated number of witnesses from the present jurisdiction with the number from the requested jurisdiction to balance the inconveniences for both sides.  Id at 662.

      Here, virtually all of the non-law enforcement witnesses would be from Florida and none would be from New York.  Mr. Myles is charged with conspiracy to violate the Arms Export Control Act, mail fraud and money laundering, all of which center on his alleged sale of airplane parts, from his business in Pompano Beach, Florida, to another business in Florida (Extreme Eyewear) and to buyers in Spain, Thailand and the United Arab Emirates.  Material testimony regarding those transactions could potentially come from employees of both Florida companies, business associates of the defendants, and business advisors, all of whom would be located in Florida.  Other witnesses - past customers and/or past suppliers - though perhaps not exclusively located in Florida, are still more closely related to Florida.  Mr. Myles estimates that roughly one-quarter of his suppliers are located in Florida, with the rest in Georgia, Texas, California, and elsewhere in the country.  For these out-of-state witnesses, Miami is an equally, if not more accessible, location as New York.  Miami would also be an equally accessible location for any potential witnesses based overseas.

      Moreover, the elements for violations of the AECA, mail fraud and money laundering all include a mens rea  requirement of intentional conduct, including intentional deceit and

concealment of the source of his income. Because the Government's case must hinge on demonstrating Mr. Myles intent, a significant part of the defense case will be in the form of character testimony from his many personal relations and business associates in Florida. Courts have repeatedly stressed that for character testimony, it is especially important that the witnesses testify near their homes, where their reputation and standing within the community are more well-known. Should character witnesses be required to testify far from the community in which they and the defendant live, their effectiveness will be blunted if not wholly negated. As Justice Murphy explained:

> Very often the difference between liberty and imprisonment in cases where the direct evidence offered by the government and the defendant is evenly balanced depends upon the presence of character witnesses. . . . The inconvenience, expense and loss of time involved in transplanting these witnesses to testify in trials far removed from their homes are often too great to warrant their use. Moreover, they are likely to lose much of their effectiveness before a distant jury that knows nothing of their reputations.

Johnson, 323 U.S. 273, at 279. Consequently, courts in this District have transferred cases where such character testimony will play a central role at trial. See, e.g., United States v. Martino, No. 00 CR 389, 2000 WL 1843233, at *6 (S.D.N.Y. Dec. 14, 2000) ("As courts have recognized, the impact of character witnesses is generally greater in the district where such witnesses live and work."); see also United States v. Aranoff, 463 F.Supp. 454, 458 (S.D.N.Y., 1978).

In the present case, where Mr. Myles is charged with a crime involving the exportation of military parts to foreign countries, the availability and credibility of witnesses to testify to his character, especially his loyalty and patriotism, may be essential to his defense. As alluded to above, Mr. Myles has been active in the Florida community for over thirty years and anticipates being able to call upon many of his distinguished colleagues in the community. Those witnesses

would be hindered from testifying if the trial were held in New York, and the effectiveness of their testimony would be blunted.

**3. The Majority of the Events Likely to be at Issue Are Located in Florida.**

Venue is most appropriate in the location of the "nerve center" of the alleged criminal activity. Alter, 81 F.R.D. at 526. The "nerve center" is the central location of the allegedly criminal acts charged against a defendant. Id. In evaluating the location of the nerve center, courts have looked at the location of the management of the operation, of the majority of the charged acts, of the defendant's property and records, of any transactions and any financial institutions used, and of the defendant's arrest. See id. (granting transfer where allegations mostly involved conduct in Miami, even though the defendants' company, whose conduct was at issue, maintained an office in New York); Russell, 582 F.Supp. at 661-663 (transferring case where the defendants' business was based in Memphis, even where funds that were part of the scheme were held for a time in New York banks and where telephone calls and telexes were placed to and from New York); Hanley, 1995 WL 60019, at *3 (transferring case where defendants engaged in a stolen check scheme from California but where the stolen check at issue was apparently taken in New York).

Here, the Government alleges that Mr. Myles, through his company Miles Aviation, based in Pompano Beach, Florida, sold spare aircraft parts to another Florida company, Extreme Eyewear, and to various overseas customers. The Government does not allege a single overt act that occurred in New York. The only connection to New York appears to be the clearing of wire transfers from overseas to Florida through the Federal Reserve Bank of New York -- a purely

administrative act that none of the alleged co-conspirators intentionally caused to happen. The clearing of the funds will not be an issue at trial and will not require any witnesses.

The nerve center of the alleged conspiracy is Florida. Both Miles Aviation and Extreme Eyewear are companies located in and operating from Florida. Their owners, George Myles and Larry Davis, are citizens of Florida. The e-mail accounts mentioned in the government's affidavit - milesaviation@aol.com and mylesaviation@yahoo.com - were registered to addresses in Florida. Even the bank into which the payments were allegedly transferred - Bank Atlantic - is headquartered in Florida.

Moreover, the government's theory of venue - that the funds passed through New York on their way from the UAE to Florida - is tenuous at best. In Russell, a couple charged with fraud in relation to shipping charges had their case initially brought in the Southern District of New York because "certain telephone and telex messages were either sent from or received in New York City and funds passed through New York on the way to the Bahamas." 582 F.Supp. at 661. Though the court there acknowledged that venue could potentially exist in New York, it ordered the transfer to Tennessee, the couple's home state, based on the weight of the Platt factors. Significantly for Mr. Myles' case, the court there noted that, "[a]lthough certain electronic messages and funds passed through New York, their passage through this, the commercial center of the United States (and perhaps the world), can hardly be considered an uncommon or significant event." Id. at 664.

The Supreme Court has also cautioned against establishing venue by such a tangential connection. In Johnson, the Court rejected the government's theory that venue can be established

in any jurisdiction where fraudulent articles passed while in the mail. 323 U.S. at 275. The Court there warned that:

> [The government proposes a theory that] an illegal use of the mails or of other instruments of commerce may subject the user to prosecution in the district where he sent the goods, or in the district of their arrival, or in any intervening district. Plainly enough, such leeway not only opens the door to needless hardship to an accused by prosecution remote from home and from appropriate facilities for defense. It also leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution.

Id.

Similarly, the Second Circuit, in Cashin, a securities fraud case where the defendants acted in Alabama but certain mailings were sent from New York, warned of prosecutorial abuse where venue was selected based only on mailings "to suit [the government's] sole convenience simply by alleging mailings only at places where it wished the trial to be held." 281 F.2d 669, 675 (2d Cir. 1960).

Comparing articles passing through the mail to funds wired through electronic networks suggests that, even if venue is possible based solely on passage of funds, it is not appropriate.[2] Unlike Russell and Cashin, where defendants at least committed some overt act in New York, the connection here with Mr. Myles is purely involuntary. He had no control or knowledge over the pathways that the electronic signals of a wire transfer would take on its way from one continent to another, any more than the Johnsons had in a previous era of which route their mails would take within the postal system.

---

[2] While not at issue in this motion, Mr. Myles does not concede that venue is proper in the Southern District of New York. Venue is an element that the Government must prove at trial, and Mr. Myles reserves his right to make an appropriate challenge at that time.

New York's role as the financial capital of the world - alluded to in Russell - should make this court particularly wary of accepting venue solely based on fund transmissions. Such a lenient policy would allow the Government to bring almost any case involving financial transactions in the Southern District of New York, dragging defendants with no other connections to this district solely at the government's discretion.

**4. Relevant Documents Are Located In Florida**

It is indisputable that the majority of documents were originally in Florida and obtained by the government during its searches on Miles Aviation and Extreme Eyewear. Further, the government's affidavit in support of its search warrant in Florida mentioned, in addition to records and computers, that it would also be seizing "any and all aviation parts that are or may be USML items or defense articles."

Since the instigation of this prosecution, the Government may have transferred some of that discovery to New York (the defense does not know where the discovery is currently located). The government cannot, however, in opposing Mr. Myles' motion, rely on the fact that some documents may currently be in New York where it was responsible for transferring them here in preparation for trial. See United States v. Spy Factory, 951 F.Supp. 450, 458 (S.D.N.Y. 1997) ("It would be grossly unfair to permit the government to 'create' venue, or to alter the balance of relevant considerations, simply by shipping documents.").

If anything, the location of the documents is a neutral factor given the modern ease with which documents can be transported. See id. ("Documents moved here can just as easily be moved back to New York, or photocopies may be shipped there.").

**5. Disruption of business Is Not Relevant Here**

As Mr. Myles is currently in the custody of the Bureau of Prisons, and his business, Miles Aviation, has ceased operation, there would be no disruption of his business. This factor does not weigh in favor of either district.

**6. Trial in New York Would Result in Greater Expense to Mr. Myles, His Family and Potential Witnesses.**

Given the large amount of discovery and the complexity of the Arms Export Control Act and its attendant regulations, a trial would likely span multiple days or weeks. The expense of living as a visitor for such a lengthy period of time in New York City, the most expensive city in the country, would be significant.

If the trial is held in New York, any Florida witnesses (essentially every non-law enforcement witness) will have to travel to New York City and reside here for as long as necessary to prepare for and participate in the trial. This burden will be most difficult for Mr. Myles' wife and children, who have already lost significant income due to his incarceration during a time when two of his daughters are in college. Mr. Myles has no relatives in the New York area who would be able to offer his family members lodgings or help defray the considerable cost of travel or food for the entire duration of trial. And, as argued above, the greater expense of travel will certainly reduce the ability of the defense to call character witnesses on his behalf.

**7. Counsel in Florida Are More Familiar with Mr. Myles's Case**

Mr. Myles is currently represented by the Federal Defender Office in the Southern District of Florida on his appeal from a conviction last year on charges also alleging the illegal

sale of parts from his business Miles Aviation. A transfer to the Southern District of Florida would allow for both of his cases to be handled from one office. In addition, whatever investigation that will be required in Florida to prepare this case can be more easily and efficiently handled by Florida counsel. There does not appear to be any investigation necessary in New York.

**8. Florida Is More Accessible Than New York**

As mentioned above, Miami is much more accessible to the majority of witnesses than New York. For those flying in from elsewhere, Miami would still be equally accessible. Miami has a large international airport that is just over six miles from the Southern District of Florida courthouse.

**9. Docket condition are better in the Southern District of Florida than in the Southern District of New York**

Based on statistics from the Administrative Office of the United States Courts, docket conditions in the Southern District of Florida as compared to the Southern District of New York favor transfer. As of March 31, 2006, the Southern District of New York had 3,649 criminal cases pending with 28 active judges for a total of over 131 criminal cases per judge, whereas the Southern District of Florida only had 1,053 criminal cases pending with 21 active judges, for a total of just over 50 cases per judge. See Administrative Office of the United States Courts, Federal Judicial Caseload Statistics, Table D (March 31, 2006), found at http://www.uscourts.gov/caseload2006/tables/D00CMar06.pdf.

While admittedly less significant than other factors, the docket conditions favor transfer to Florida.

**CONCLUSION**

All of the events at issue in this case occurred in the Southern District of Florida while none occurred in New York. Mr. Myles has deep and long-standing ties to Florida while he has none to New York. There are many potential witnesses located in Florida while there are none in New York.

Every significant Platt factor weighs in favor of Mr. Myles. Accordingly, this Court should exercise its discretion and transfer the case to the Southern District of Florida.

Dated: New York, New York
September 26, 2007

LEONARD F. JOY, ESQ.
Federal Defenders of New York
Attorney for Defendant
**GEORGE MYLES**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8762

______________________
**DAVID E. PATTON**

TO: MICHAEL J. GARCIA, ESQ.
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
Attn.: **CHRISTOPHER LAVIGNE, ESQ**.
Assistant United States Attorney