UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   -v.-                              :          07 Cr. 840 (PAC)

GEORGE FRANK MYLES, Jr.,          :
     a/k/a "George Miles,"

                                :

               Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York,
Attorney for the United States of
America


CHRISTOPHER L. LAVIGNE
JENNIFER G. RODGERS
Assistants United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B. A Transfer Of Venue Is Not In The
        Interests Of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.      Residence Of The Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.      Location Of Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        3.      Location Of Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.      Location Of Relevant Documents And Records . . . . . . . . . . . . . . . . . 20

        5.      Disruption Of Myles' Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        6.      Expenses To The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        7.      Location Of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        8.      Relative Accessibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        9.      Docket Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        10.    Special Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    C. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :

   -v.-                                         :          07 Cr. 840 (PAC)

GEORGE FRANK MYLES, Jr.,              :
    a/k/a "George Miles,"
                                                       :

           Defendant              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE

      The Government respectfully submits this Memorandum of Law in opposition to the motion of Defendant George Frank Myles, Jr., a/k/a "George Miles," to transfer venue to the United States District Court for the Southern District of Florida. For the reasons set forth below, the defendant has failed to meet his burden of justifying a transfer of venue to Florida. Accordingly, the defendant's motion should be denied.

### STATEMENT OF FACTS

      This Indictment is the product of a three-year investigation by the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") into the illegal export of military aviation equipment, including parts for the F-14 military fighter jet, from the United States to Iran.[1] The investigation has focused on an Iranian national ("CC-1") who has been obtaining military aviation parts from a number of different United States aviation

---

[1]    The underlying Complaint against George Frank Myles, Jr., a/k/a "George Miles" and his co-defendants is attached hereto as Exhibit A, and the underlying Indictment against Myles is attached hereto as Exhibit B.

parts suppliers over the last several years.  (Compl. Aff. ¶ 7.)[2]  In doing so, CC-1 has relied on other associates, who are suspected Iranian nationals and have assisted CC-1 in contacting various domestic aviation parts suppliers for military aviation parts, and for arranging their delivery to various overseas locations, particularly, Dubai, United Arab Emirates ("UAE") (Compl. Aff. ¶¶ 7, 8.)

ICE's investigation into CC-1 was launched in or about the spring of 2004 when CC-1 contacted an aviation parts supply company located in this District, in Westchester, New York, via email.  In this email, CC-1 identified himself as an Iranian national, and sought aviation-related publications and materials for his Iranian business. Since that occasion, CC-1 and CC-1's associates have contacted a number of United States based aviation parts companies, and other companies, to solicit from them military aviation equipment. (Compl. Aff. ¶¶ 7, 8, 15.)  One individual who agreed to assist CC-1 and CC-1's associates in their scheme to obtain military aviation equipment from the United States was George Myles, the defendant.

Myles was the owner and operator of Myles Aviation, a/k/a "Miles Aviation," an aviation parts supply company that operated in Pompano Beach, Florida and which supplied aviation parts to a variety of customers.  (Myles Aff. ¶ 11.)  As set forth in the Complaint, because of the national security dangers that could result from American military technology being procured by countries that pose a risk to the United States and other nations, the aviation

---

[2]    For purposes of this brief, "Compl. Aff." refers to the Affidavit in support of a search warrant of Myles' place of business, which was incorporated by reference into the Complaint, and is attached hereto as Exhibit A; "Indictment" refers to the Indictment against Myles; "Venue Br." refers to the brief submitted by Myles in support of the present motion; and "Myles Aff." refers to the Affidavit submitted by Myles in support of the present motion.

parts industry is highly regulated by the United States Department of State ("DOS").  (Compl. Aff. ¶ 4.).  In order to export defense articles listed on the United States Munitions List ("USML") (i.e. those categories of items determined to carry the greatest risk to our national security should they be obtained by America's enemies) from the United States, for example, exporters must obtain permission or authorization from DOS.  (Compl. Aff. ¶ 4(b).)  Indeed, registration with DOS is required for all entities that export USML items or even broker USML items.  (Compl. Aff. ¶ 4(c).)

Starting in or about the spring of 2005 until in or about March 2007, however, Myles Aviation began dealing with overseas entities and individuals who sought USML items, and began exporting such items, some of which included parts for the F-14 military fighter jet, to those entities and individuals.  At all times relevant to the Indictment, however, neither George Myles nor Myles Aviation ever registered with DOS as an exporter or broker of USML items, or obtained an export license from DOS.  (Compl. Aff. ¶ 17(a).)  The entities and individuals to which Myles sent USML parts were purportedly located in, and operating out of, Dubai, UAE and Thailand.  (Indictment ¶ 4 (a).)  Evidence obtained in the course of this investigation, however, indicates that certain of these individuals were actually operating out of Iran, and that their ultimate customers were in Iran.  (Compl. Aff. ¶¶ 7, 9(d), 17(d), 17(f), 17(g).) [3]

George Myles agreed to supply USML materials to these overseas entities. Initially, Myles agreed to supply these entities with USML parts by using a conduit named Lawrence Davis, a/k/a "Larry Davis," who operated a sunglass company in Florida called

---

[3]     This is not surprising, given that, according to publicly available information, Iran is the only country in the world presently operating fleets of the F-14 military fighter jet.

Extreme Eyewear LLC, a/k/a "Extreme Eyeware." (Compl. Aff. ¶ 13.)[4] Generally speaking, an overseas co-conspirator ("CC-2") would contact a Myles Aviation employee, Gwendolyn Douglas, by email to solicit USML parts. (Compl. Aff. ¶¶ 14(a)-(f).)[5] Douglas then contacted various entities across the country via email in search of these parts, and later provided CC-2 with quotes for those parts. Once an order was made for those USML parts, Davis picked up the parts from Myles Aviation and shipped them to CC-1 at a purported company address in Dubai, UAE. (Compl. Aff. ¶¶ 9(c)-(e).)

In exchange for these services, CC-1 arranged for wire transfers from money exchanges in Dubai, UAE to Davis, via the Federal Reserve Bank of New York and a correspondent bank located in Manhattan, New York. (Compl. Aff. ¶ 12(b).) From these transfers, Davis paid Myles for the USML parts he supplied to CC-1 and CC-2. This arrangement existed from about April 2005 until in or about May 2006. During this period, it is currently estimated that Davis made approximately ten shipments of USML parts from Extreme Eyewear's place of business in Florida to Dubai, UAE.[6]

Subsequently, Myles began dealing with CC-2 and his associate directly, rather than using Davis as a conduit. (Compl. Aff. ¶ 15.) Starting in or about December 2006 and not

---

[4]     Davis was named as one of Myles' co-defendants in the Complaint. Davis has not yet been indicted.

[5]     Douglas was named as one of Myles' co-defendants in the Complaint. Douglas has not yet been indicted.

[6]     Documents obtained from DHL reveal that these shipments went from Ft. Lauderdale, Florida, to a DHL hub in JFK International Airport ("JFK") in Queens, New York. From JFK, the parts traveled to Dubai, UAE. At least one such shipment, however, was traced from Dubai, UAE to Tehran, Iran. (Compl. ¶ 9(d).).

ending until Myles' incarceration on an unrelated federal matter in or about March 2007, Myles

exported USML parts and other aviation parts to a third co-conspirator ("CC-3") located in

Dubai, UAE, and to yet another co-conspirator located in Bangkok, Thailand.  (Indictment ¶

4(a).)  While certain of these shipments were addressed to CC-3, they were for orders that were

placed over email by CC-2 with Douglas.  (Compl. Aff. ¶ 15.)  In addition to personally shipping

these items, Myles agreed with CC-2 to undervalue the contents of these shipments.  (Indictment

¶¶ 4(b), 5-6.)  This had the effect of, among other things, reducing customs duties that CC-2 and

his associates needed to pay upon receiving the USML parts in Dubai.  (Compl. Aff. ¶ 16 n.7.)

Notably, the direct shipments from Myles to CC-3 in Dubai, UAE, all occurred

after: (1) George Myles was denied registration by DOS as a broker of USML parts, in or about

May 2006; and (2) George Myles was convicted in federal court in another district for

committing aircraft parts fraud, in violation of Title 18, United States Code, Section 32.  (Compl.

Aff. ¶¶ 17(a) n.8, 18.)[7]

In exchange for Myles having provided this direct service, CC-1 arranged for a

series of wire transfers to Myles' bank account in Florida through another co-conspirator ("CC-

4") via the al-Fardan Exchange in Dubai, UAE.  (Compl. Aff. ¶¶ 17(b), (f), (j).)  These wire

transfers were sent from Dubai, UAE to Myles' Wachovia bank account in Florida via the

Federal Reserve Bank of New York and a Wachovia correspondent bank in New York.  Receipts

for certain of these transfers from the Dubai money exchange were sent via email from CC-4 to

CC-1, and indicate that the amounts for the wire transfers were drawn off of a Wachovia bank

located in New York.  (Compl. Aff. ¶¶ 17(f), (j).)  Based on these receipts, and based on records

---

[7]        A copy of the aircraft parts fraud indictment is attached hereto as Exhibit C.

obtained from the Federal Reserve Bank of New York, the entity from whom these transfers

originated was a Dubai company, which is listed in the Iranian business directory in Dubai.

(Compl. Aff. ¶ 17(g).)

On or about March 9, 2007, Myles was sentenced to a 78-month term of

imprisonment by the Honorable Cecilia M. Altonaga for his conviction after trial on aircraft parts

fraud.  (Compl. Aff. ¶ 18.)  As shown by Exhibit C, the charges on which Myles was found guilty

concerned his sale of  aircraft parts to the United States military and falsely certifying, among

other things, their airworthiness.

On or about April 11, 2007, Myles and two co-defendants, Lawrence Davis and

Gwendolyn Douglas, were charged in a Complaint with conspiracy to violate the Arms Export

Control Act.  On or about September 6, 2007, Myles was indicted for: (1) conspiracy to violate

the Arms Export Control Act; (2) conspiracy to commit mail fraud; (3) conspiracy to commit

money laundering; and (4) six separate, substantive counts of violating the Arms Export Control

Act.  Davis and Douglas have not yet been indicted.  The Government does anticipate

superceding charges being filed in this case, which would add additional defendants.

## ARGUMENT

### DEFENDANT'S MOTION TO TRANSFER VENUE SHOULD BE DENIED

As described below, the defendant cannot satisfy his burden of showing that a

transfer of this prosecution from the district in which it was brought is warranted.  Indeed, this

case is properly brought in this district, as the charged conspiracy is international in scope, and,

in fact, was based in Dubai and Iran.  In addition, while the defendant will not be prejudiced by

the case proceeding in this district, the Government will be prejudiced were the matter sent to the

proposed venue of the Southern District of Florida.  Therefore, Defendant's motion to transfer

should be denied.

## A.    <u>Applicable Legal Standards</u>

Rule 21(b) of the Federal Rules of Criminal Procedure provides that "for the

convenience of parties and witnesses, and in the interest of justice, the court upon motion of the

defendant may transfer the proceeding as to that defendant or any one or more of the counts

thereof to another district."  Fed. R. Crim. P. 21(b).  The "burden is on the moving defendant to

justify a transfer under Rule 21(b)."  <u>United States</u> v. <u>Spy Factory, Inc</u>., 951 F. Supp. 450, 464

(S.D.N.Y. 1997) (citing <u>United States</u> v. <u>Aronoff</u>, 463 F. Supp. 454, 460 (S.D.N.Y. 1978)); <u>see

also</u> <u>United States</u> v. <u>Washington</u>, 813 F. Supp. 269, 275 (D. Vt. 1993), <u>aff'd</u>, 48 F.3d 73 (2d Cir.

1995), <u>cert. denied</u>, 515 U.S. 1151 (1995); <u>United States</u> v. <u>Wheaton</u>, 463 F. Supp. 1073

(S.D.N.Y. 1979), <u>aff'd</u>, 614 F.2d 1293 (2d Cir. 1979).  Furthermore, the moving defendant must

provide "factual substantiation" for his contentions that a transfer is in the interests of justice.

<u>United States</u> v. <u>Williams</u>, 437 F. Supp. 1047, 1051 (W.D.N.Y. 1977); <u>see also</u> <u>United States</u> v.

<u>Spy Factory</u>, 951 F. Supp. at 456 ("the court must rely on 'concrete demonstrations'" of fact).

The decision whether to grant a motion for change of venue is "vested in the sound discretion of

the district court."  <u>United States</u> v. <u>Maldonado-Rivera</u>, 922 F.2d 934, 966 (2d Cir. 1990), <u>cert.

denied</u>, 501 U.S. 1211 (1991).

It is well-settled, however, that "[a]s a general rule a criminal prosecution should

be retained in the original district" in which it was filed, unless a court finds it would not be in

the interests of justice to do so.  <u>United States</u> v. <u>United States Steel Corp.</u>, 233 F. Supp. 154,

157 (S.D.N.Y. 1964) (Weinfeld, J.) (noting that to "warrant a transfer from the district where an

indictment was properly returned it should appear that a trial there would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome"); see also United States v. Wilson, No. 01 Cr. 53 (DLC), 2001 WL 798018, at *1 (S.D.N.Y. July 13, 2001) (citing United States v. Guastella, 90 F. Supp. 2d 335, 338 (S.D.N.Y. 2000)); Spy Factory, 951 F. Supp. at 464 (citing United States v. Posner, 549 F. Supp. 475, 477 (S.D.N.Y. 1982)).

       In assessing a motion to transfer venue, the district court should weigh a variety of factors, including (1) the location of the defendant's residence; (2) the location of possible witnesses; (3) the location of events likely to be at issue; (4) the location of relevant documents and records; (5) the potential for disruption of the defendant's business if transfer is denied; (6) expenses to be incurred by the parties if transfer is denied; (7) the location of counsel; (8) the relative accessibility of the place of trial; (9) the docket conditions of each potential district; and (10) any other special circumstance that might bear on the desirability of the transfer. See Platt v. Minnesota Mining Co., 376 U.S. 240, 244 (1964); Maldonado-Rivera, 922 F.2d at 966. No single factor is dispositive in this analysis; rather, it is left to the district court to "strike a balance and determine which factors are of greatest importance." Maldonado-Rivera, 922 F.2d at 966; see also United States v. Stephenson, 895 F.2d 867, 875 (2d Cir. 1990).

**B.**     <u>A Transfer Of Venue Is Not In The Interests Of Justice</u>

Analysis of each of the relevant factors makes clear that defendant Myles has failed to meet his burden of demonstrating that this case should not be prosecuted in the district in which it was brought.

**1.**     <u>Residence Of The Defendant</u>

The residence of the defendant is a factor to be considered in deciding a change of venue motion, which stems from courts' recognition that it can be a "hardship" for a defendant to stand trial away from home, and away from appropriate "facilities for defense." <u>Aronoff</u>, 463 F. Supp. at 457 (internal quotations omitted). It is well established, however, "that inconvenience of the defendant or his business is not, by itself, a sufficient basis for transfer," <u>United States</u> v. <u>Conner</u>, No. 00 Cr. 731 (GBD), 2001 WL 114314, at * 3 (S.D.N.Y. Feb. 9, 2001) (quoting <u>United States</u> v. <u>Culoso</u>, 461 F. Supp. 128, 136 (S.D.N.Y. 1978)); <u>United States</u> v. <u>Antia</u>, 1999 WL 294788, at *2 (E.D.N.Y. Mar. 22, 1999) (citing <u>Wheaton</u>, 463 F. Supp. at 1078). Similarly, courts have repeatedly held that a defendant's residence should not be given "dispositive weight." <u>Spy Factory</u>, 951 F. Supp. at 456.

In fact, while it is true that courts should give consideration to trying defendants where they reside, <u>United States</u> v. <u>Russell</u>, 582 F. Supp. 660, 662 (S.D.N.Y. 1982), courts have noted that this "policy" of trying defendants in their district of residence is "in tension with the more general presumption that a criminal prosecution should be retained in the original district." <u>Spy Factory</u>, 951 F. Supp. at 464. Thus, the "defendant's home district is relevant only as far as considerations of fairness and justice demand." <u>Aronoff</u>, 463 F. Supp. at 457.

The defendant is presently in the custody of the Bureau of Prisons ("BOP"), and

has an estimated release date of November 5, 2012.  While there is no dispute that the defendant

was designated to a BOP facility in Florida to serve his sentence, this fact does not weigh in

favor of transferring this matter.  The main purpose of this factor, as referenced above, is to give

some weight to the fact that it is much more convenient for the defendant to be tried where he

lives in order to avoid the expense and inconvenience of excessive travel to and from the trial

site and of living away from home for extended periods of time.

This factor is less crucial where, as here, the defendant is federally incarcerated

on an unrelated sentence.  In short, for the next five years, Myles resides wherever the BOP says

he resides.  See 18 U.S.C. § 3621(b) (noting that the BOP "shall designate the place of the

prisoner's imprisonment" giving consideration to certain statutory factors and "may at any time,

having regard for the same matters, direct the transfer of a prisoner from one penal or

correctional facility to another").  Accordingly, Myles should not be considered as residing in

Florida at the present time, particularly not when the convenience purposes behind considering

the domicile of the defendant are examined.  Myles is not at liberty and will not be at liberty

during the pendency of this matter.  He currently is housed across the street from the courthouse

where his case is being tried.  As a result, the distance of the trial from his former home is of no

moment, and his present incarceration in this district–with no additional expense to him–should

actually weigh against transfer.  See United States v. Elson, 968 F. Supp. 900, 903 (S.D.N.Y.

1997) (finding that transfer to Eastern District of New York was inappropriate where, among

other things, defendant was incarcerated in this district); see also United States v. Hunter, 672

F.2d 815, 818 (10th Cir. 1982) (affirming denial of transfer where, among other things,

defendant was incarcerated in the district of pending prosecution), overruled on other grounds,

10

United States v. Call, 129 F.3d 1402, 1404 n.2 (10th Cir. 1997).

Similarly, Myles' references to his incarceration in this district hampering his ability to see his family does not warrant transfer. As an initial matter, it is well settled that "every litigation, particularly a criminal prosecution, imposes burdens upon a defendant and brings in its wake dislocation from normal occupational and personal activities." Culoso, 461 F. Supp. at 136. Secondly, a defendant's desire to be near his or her family during the pendency of litigation does not warrant transfer. See United States v. Valdes, 05 Cr. 156, 2006 WL 738403, at * 4 (S.D.N.Y. March 21, 2006) ("While a defendant would always like to be close to his loved ones, this desire *alone* is insufficient to warrant a transfer.") (internal quotation omitted) (emphasis in original); United States v. Wilson, No. 01 Cr. 53 (DLC), 2001 WL 798018, at * 2 (S.D.N.Y. July 13, 2001) (Cote, J.) (denying motion to transfer notwithstanding fact that trial in New York would cause significant burden on defendants and their families by creating need to coordinate medical care and to cope with recent death of defendant's mother absent network of friends).

While family obligations can weigh in favor of transfer, there necessarily must be actual obligations that would be impeded were the trial to proceed in a district other than the defendant's domicile. See, e.g., United States v. Hanley, 94 Cr. 394, 1995 WL 60019 at *2 (S.D.N.Y. Feb. 10, 1995) (noting that transfer was supported by defendant's family obligations in California including care of three year old and elderly mother whom he visited four times per week). Here, Myles can articulate no such obligations or responsibilities, given that he has been incarcerated on unrelated federal charges since March 2007, and will be incarcerated on those charges for the next five years. Thus, while Myles understandably prefers to be closer to his

family during the pendency of this litigation, this fact is insufficient to warrant transfer.[8]

2.      **Location Of Witnesses**

The defendant next claims that Florida is a more convenient forum for witnesses but fails entirely to satisfy his burden with respect to this second Platt factor.  A defendant claiming that the location of witnesses warrants a transfer of venue bears the burden of offering the Court "specific examples of witnesses' testimony and their inability to testify because of the location of trial."  Spy Factory, 951 F. Supp. at 456.  The "naked allegation that witnesses will be inconvenienced by a trial in a distant forum will not suffice for transfer."  Id.; see also Guastella, 90 F. Supp. 2d at 339 (finding transfer of case to Nevada was inappropriate where "[d]efendants have not provided the Court with specific examples of witnesses' testimony, nor have defendants indicated why their witnesses would be unable to testify in New York"); United States v. Juncal, No. 97 Cr. 1162 (JFK), 1998 WL 473949, *5 (S.D.N.Y. Aug. 7, 1998) (holding that "there is no basis to grant the motion to transfer" where defendant fails to make "a specific proffer of testimony from specific witnesses to allow the court to make an informed decision about the importance of these witnesses to [the defendant's] case").  Rather, "defendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial . . . the court must rely on concrete demonstrations of the proposed testimony."  Spy Factory, 951 F. Supp. at 456 (internal quotations and citations omitted).

Here, in the place of specific examples of witnesses who would be unable to

---

[8]      While Myles notes that his mother has been unable to visit him since his incarceration in New York, Myles' mother resides in Augusta, Georgia (Myles Aff. ¶ 11), which is approximately 600 miles from his previous place of incarceration in Miami, Florida, as compared to 1200 miles from New York.  Thus, Myles would face similar difficulties in seeing his mother were he returned to the prison at which he was designated by the BOP.

12

testify if this case were tried New York, the defendant offers the general claim that an unspecified number of potential fact and character defense witnesses reside in Florida. (Venue Br. at 8-10). Indeed, Myles fails even to allege that any of these potential witnesses would be unable to testify at a trial held in New York. No doubt this is partly because witness expenses for indigent defendants would be provided for by statute. See 28 U.S.C. §§ 1821, 1825; Fed. R. Crim. P. 17(b); Spy Factory, 951 F. Supp. at 456 (finding that defendants failed to carry their burden that the location of the witnesses justified transfer where, among other things, expenses for defendants' witness would be provided for through Criminal Justice Act funds).

On the other hand, recognizing that expenses for Government witnesses would similarly not present an issue, the Government can still articulate very real burdens that at least some of its locally-based witnesses would bear were this case to be tried in Florida. The Government currently anticipates that it would call at least two New York-based ICE agents, one New York-based Customs and Border Protection ("CBP") agent, employees of New York-based banks, one DOS agent based in Washington, D.C., and likely another ICE agent based in the United States or Dubai. The costs to these witnesses in terms of their time in having to travel to Florida would be enormous, as would the monetary cost to the Government in having to bring all of these witnesses to Florida for testimony.

Other than law enforcement agents, the Government would likely call other witnesses from around the country, including representatives from manufacturers of certain aviation parts and aviation parts suppliers who dealt with Myles and his co-conspirators on a regular basis. Further, the Government may also call some of the defendant's associates and employees in Florida as witnesses in this matter, and will bear the expense of doing so for trial in

13

New York.[9]

In short, the defendant has failed to suggest any potential defense witness that would be so greatly inconvenienced by trial in New York that venue should be transferred. Additionally, even if the defendant had identified such witnesses, the inconvenience those witnesses would be likely to experience would have to be counterbalanced against inconveniences that would be visited upon Government witnesses were the case to be transferred. In such circumstances, where a trial would be as convenient (or inconvenient) for witnesses in either the district of filing or the proposed transferee forum – not the case here, where only the Government has identified specific witnesses, most of whom are located in New York – courts have routinely denied requests for transfer. See, e.g., United States v. Projansky, 465 F.2d 123, 139 & n.34 (2d Cir. 1972), cert. denied, 409 U.S. 1006 (1972); United States v. Carey, 152 F. Supp. 2d 415, 422-23 (S.D.N.Y. 2001); United States Steel Corp., 233 F. Supp. at 158.

Moreover, the argument of the defendant concerning the importance of character witnesses testifying before a "home crowd" seems anachronistic and outdated, even if supported by some case law. The potential settings for this trial are large metropolitan areas where the likelihood of a juror having specific knowledge of a witness's reputation is small. Indeed, this presumably is why Myles does not oppose being tried in the Southern District of Florida, where his conviction for aircraft parts fraud already garnered local press and media attention.

_____

[9]    The Government is still in the process of investigating other suspected export violations against George Myles. The Government notes that Myles Aviation's customers included entities located in Saudi Arabia, and Indonesia, as well as Dubai, UAE. Thus, the Government, and possibly even the defense, may seek to call witnesses from these and other international localities.

14

More likely, the credibility of the character witnesses called by the defendant will hinge on how well the witnesses know the defendant and in what contexts, factors that can be weighed equally well by jurors anywhere. Defendant has failed to identify anything about any of his potential witnesses that would make them more recognizable or their reputations more apparent to Floridians than to New Yorkers. In fact, if any prospective jurors did know any of the defendant's purported witnesses, then such juror would likely be disqualified during the voir dire process.

Because the defendant has failed to provide a single "specific example[] of witnesses' testimony and . . . inability to testify because of the location of trial," Spy Factory, 951 F. Supp. at 456 (internal quotations and citations omitted), he has simply failed to meet his burden of proving that the location of necessary and relevant witnesses compels a transfer to Florida.

### 3.    Location Of Events

Likewise, the defendant fails to demonstrate that the location of events in this case warrants transfer. Defendant argues that this matter should be transferred essentially because the "nerve center" of this conspiracy was in Florida rather than New York. (Venue Br. at 11-14). This argument misapprehends the nature of the charged conspiracies and misapplies relevant case law.

The charged conspiracy was international in scope, with the true "nerve center" lying in the Middle East — specifically Dubai and Iran. Courts have routinely decided that where a defendant's conduct is national or international in scope, transfer is not warranted merely because significant criminal conduct occurred in the transferee jurisdiction. See, e.g.,

Wilson, 2001 WL 798018, at *2 (Cote, J.) (denying transfer motion where the "principal activities" of the fraud scheme occurred in San Francisco, where the defendants lived, but also in St. Louis and Columbus because it "was not a crime whose planning, execution, or impact was limited by geography"); Guastella, 90 F.Supp.2d at 339 (finding that location of events did not justify transfer to Nevada even though investment scheme was initiated there because criminal activity in the case was "national and even international in scope"); Spy Factory, 951 F. Supp. at 457 ("Because the criminal activity that was alleged to have occurred in this case was concededly national in scope, the location of the events at issue favors neither side.").

As summarized above, ICE New York's investigation into CC-1 began in the first place because CC-1 solicited aviation related materials from a company located in Westchester, New York in or about the spring of 2004. Since then, CC-1, CC-2, and their associates have repeatedly contacted aviation parts suppliers from across the country and world in the hopes of obtaining USML parts. Myles acted as one of many conduits who agreed to provide these USML parts to CC-1 and CC-2. Myles was not the manufacturer of these parts; his role in the charged conspiracy was to obtain the parts from various manufacturers across the country and ship them to the next link in the chain from the United States to Iran. It is thus patently inaccurate to characterize the "nerve center" of this conspiracy as being located in Florida. The masterminds and originators of this conspiracy were and are located in the Middle East. Myles, like other aviation parts companies, was solicited by these individuals, and agreed to assist them. The overseas nationals utilized Myles because he was willing to obtain USML parts and cause them to be shipped in violation of the law. Myles' location in Florida had no importance to his co-conspirators overseas and likewise no importance to the execution of the scheme itself.

16

Indeed, Myles' crimes were almost exclusively conducted by means divorced from any particular location, such as email, telephone, facsimile, mail, overseas shipping, and wire transfers. This simply is not the sort of case where knowledge of the location at which certain events occurred – such as a crime scene in a murder case, for example – could in any way prove relevant to trial of this matter.

And, while Myles does not explicitly challenge venue in this motion, correctly noting that venue is an issue for trial, venue in this district is proper. As noted above, the charged offenses are international in scope, occurring in multiple jurisdictions and localities. 18 U.S.C. § 3237 provides that for such offenses, the offense may be prosecuted "in any district in which such offense was begun, continued, or completed." This statute further provides that "any offense involving use of the mails [or] transportation in interstate or foreign commerce . . . is a continuing offense and . . . may be inquired of and prosecuted in any district from, through, or into which such commerce [or] mail matter moves." Id.; see also United States v. Rodriguez-Moreno, 526 U.S. 275, 281 (1999) ("[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.") (quoting United States v. Lombardo, 214 U.S. 73, 77 (1916)); United States v. Durrani, 659 F. Supp. 1177, 1182 (D. Conn. 1987) (noting that violations of the Arms Export Control Act are continuing offenses and "require only that the commerce move[s] through this district").[10] In addition, it is well-settled that in conspiracy prosecutions, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators."

---

[10]    Indeed, while Myles references for support the Supreme Court's decision in United States v. Johnson, 323 U.S. 273 (1944), (Venue Br. at 13), that case does not support Myles' argument, as it pre-dated the enactment of 18 U.S.C. § 3237.

United States v. Smith, 198 F.3d 377, 382 (2d Cir. 1999) (internal quotations omitted).

Here, Myles' business was largely conducted by email, internet, facsimile, wire transfer, air courier, and telephone. While Myles and his co-conspirators did not operate out of New York in the sense of having physical offices here, they did avail themselves of New York by, for example, having the proceeds of their scheme sent by wire transfers from Dubai and New York, which courts have found in similar circumstances to support venue. See United States v. Gilboe, 684 F.2d 235 (2d Cir. 1982) (finding that venue was proper for wire fraud counts in this district where "the proceeds of the fraud were all transferred through New York"); see also United States v. Svoboda, 347 F.3d 471, 483-84 (2d Cir. 2003) (finding that venue for conspiracy to commit securities fraud and substantive securities and tender offer fraud counts was proper where trades were conducted on New York Securities Exchange and American Stock Exchange where it was reasonably foreseeable to defendant (who was conducting business out of Texas) that trades would be conducted over those exchanges); United States v. Goldberg, 830 F.2d 459, 465 (3d Cir. 1987) (holding that venue for wire fraud counts were proper since "[i]t is clear from the record . . . that the wire transfer of funds from New York to Wilmington passed through the Federal Reserve Bank in Philadelphia. Consequently, there is no doubt under § 3237 that venue was proper [in Philadelphia].") These repeated payments served to perpetuate the charged scheme, as Myles and his co-conspirators would not have continued to ship USML parts to their overseas co-conspirators had they not received payments for these shipments. These payments, therefore, that utilized systems at the Federal Reserve Bank of New York and other local New York banks, were necessary components of the charged offenses.

In addition, Myles and his co-conspirators shipped USML parts from Ft.

18

Lauderdale to CC-1, CC-2, and their associates in Dubai via DHL (an air courier service) which transported the parts from Florida to New York, and then from New York to Dubai. Courts have recognized in similar instances that the use of airspace over a district is sufficient to establish venue in that district. See United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir. 1987) (noting in prosecution for cocaine importation that venue was proper in this district because, among other things, "[t]he evidence was, however, that the course of the flight carried the airplane over the Narrows, a body of water that lies within the joint jurisdiction of the Southern and Eastern Districts of New York"); see also United States v. Prueitt, 540 F.2d 995, 1006 (9th Cir. 1976) (holding that venue was proper where evidence showed an "overflight" over the relevant district); United States v. Williams, 536 F.2d 810, 812 (9th Cir. 1976) ("Since the navigable airspace above a district is as much a part of it as a highway running through it, the fact that appellant's co-conspirator . . . flew over the district rather than driving through it is of little significance.").[11]

       Thus, the location of events does not support a transfer of this case, as venue is proper in this district and the charges are international in scope. At best, the location of the defendant's conduct in the instant case is neutral with respect to transfer, which means that the defendant has failed to carry his burden on this Platt factor.

_____

[11]     The Government also expects that the evidence will show that Myles and/or his employees did communicate with individuals in the New York area, such as CBP inspectors at JFK International airport, about certain aviation parts shipments that were seized. Although these seized shipments do not, at present, form the basis of charges against Myles, they are relevant to showing Myles' knowledge of shipping routes and, based on his responses to certain inquiries, to his intent. The Government is also in the process of obtaining flight pattern information from Florida to New York and from New York to Dubai to verify that such flights pass over areas within the Southern District of New York.

**4.    Location Of Relevant Documents And Records**

Regarding this factor, the defendant next argues that the location of the documents and records is a neutral factor, and claims that the majority of documents were originally located in Florida.  The Government agrees that this is a neutral factor, as it is in the majority of cases in light of advances in technology.  See Martino, No. S1 00 Cr. 389 (RCC), 2000 WL 1843233, at *5 (S.D.N.Y. Dec. 14, 2000); Spy Factory, 951 F. Supp. at 458; Hanley, 1995 WL 60019, at *3.

In any event, the Government notes that a significant portion of the evidence and documents in this case were obtained pursuant to search warrants signed in the Southern District of New York, specifically of email accounts utilized by Myles and his co-conspirators.  Similarly, many of the documents seized from Myles Aviation (about 60 boxes) have already been transferred to the Southern District of New York.  While some documents remain in Florida (about 30 boxes), those are in the process of being transferred to New York.  Regardless, this factor certainly does not weigh in favor of transfer, and transferring this case to the Southern District of Florida would result in the added expenses of having to ship numerous boxes of documents to Florida.

**5.    Disruption Of Myles's Businesses**

As the defendant is now in BOP custody, the defendant concedes that this factor does not weigh in his favor, as his business is no longer in operation.  (Venue Br. at 15.)

**6.    Expenses To The Parties**

The defendant next argues that the cost to the parties of having a trial in New York weighs in favor of transfer.  (Venue Br. at 15).  This argument ignores critical facts.

20

Indeed, this factor heavily weighs in the Government's favor, against transfer of venue.

First, again, defendant nowhere acknowledges that his witness-related expenses will be provided for by statute. See Maldonado-Rivera, 922 F.2d at 965-66 (affirming denial of transfer motion where indigent defendants' expenses would be so covered). Accordingly, Myles has no expenses to be weighed in connection with this factor.

Second, Myles ignores the tremendous expense that would be incurred by the Government if the Government had to move two Assistant United States Attorneys, a paralegal, and two ICE agents to Florida in order to conduct the trial. And that does not even include the additional expense the Government would need to incur in providing transportation for witnesses to testify in Florida. Moreover, the expenses would begin to accrue almost immediately, as one of the Assistant United States Attorneys would need to be present for every single court proceeding leading up to trial. In addition, at least 60 boxes of documents, among other discovery items, would need to be shipped to Florida. Courts have repeatedly denied transfer motions in part because the expense of transfer to the Government was too significant to warrant it. See, e.g., Carey, 152 F. Supp. 2d at 422-23 (noting that "if venue is transferred to the District of Columbia, the effect is merely to shift the economic burden to the government which would be required to relocate its witnesses, two United States Attorneys, three FBI agents and one paralegal during the height of the Washington, D.C. summer tourist season"); United States v. Coriaty, No. 99 Cr. 1251 (DAB), 2000 WL 1099920, at *4 (S.D.N.Y. Aug. 7, 2000); Guastella, 90 F. Supp. 2d at 341; Spy Factory, 951 F. Supp. at 459.

On these facts, the sixth Platt factor weighs against transfer.

7.    <u>**Location Of Counsel**</u>

The location of counsel clearly favors New York.  Obviously, both prosecutors are located in New York.  Moreover, the defendant is represented by extremely able counsel here in the Southern District of New York.

The defendant's suggestion that counsel in Florida are more familiar with Myles' case and are in a better position to conduct any investigation is a red herring.  For one thing, the Federal Defenders of New York ("FDNY") has represented Myles for almost five months, since his initial appearance in this matter on or about May 10, 2007.  During this representation, FDNY has sat in on one meeting between the defendant and the Government, and has been engaged in substantive discussions regarding a possible disposition.

By contrast, the Government is unaware of any attorney in the Florida area representing Myles in connection with this matter or investigation.  While Federal Defenders of Florida ("FDFL") is apparently representing Myles in connection with the appeal of his aircraft fraud conviction, two points are worth noting.  First, the aircraft fraud case against Myles is totally separate and distinct from the instant charges.  As shown by the Indictment in that case (Ex. C), the aircraft fraud charges deal with completely different acts, players, time frames, and course of conduct.

Second, FDFL was not Myles' trial counsel, or counsel for sentencing, which occurred as recently as March 9, 2007.  Rather, FDFL was assigned as Myles' appellate counsel not long before FDNY was assigned to represent Myles in this case, and already has filed Myles' appellate brief, on July 30, 2007 (Myles. Aff. ¶ 13.)  This case is therefore unlike  <u>Martino</u>, where the court granted defendant's transfer motion partly because the defendant would be able

to retain an attorney in the transferee jurisdiction who had represented him for three years in connection with the criminal conduct there in issue. See Martino, 2000 WL 1843233, at *7. The fact that Myles was recently appointed Florida counsel in a separate, unrelated appeal should not weigh in favor of transferring this case.

In short, while FDNY may yet be in the early stages of their representation of the defendant, FDNY certainly knows more about the defendant's case than any other potential defense counsel, and transferring this case will require new counsel to spend months getting up to speed on this matter. Accordingly, this Platt factor weighs against transfer.

**8.     Relative Accessibility**

Because the courts in New York and Florida are of comparable accessibility, this factor does not favor transfer. As summarized above, possible witnesses are located throughout the country, with some located in New York, Florida, and elsewhere – even possibly overseas.

Defendants' argument that Miami is more accessible than New York is simply overreaching. Many non-Florida witnesses are located in New York, or closer to New York than Miami. Again, the Government respectfully submits that this factor does not weigh in favor of either party and, as a result, Myles fails to carry his burden that transfer is justified on this factor.

**9.     Docket Conditions**

Differences in docket conditions between the Southern District of New York and the Southern District of Florida do not weigh in favor of transfer. Defense counsel goes to great length to assemble statistics that show that the docket in the Southern District of New York is more congested than in the Southern District of Florida.

These statistics, however, do not touch on the most important docket as far as this

argument goes – this Court's.  It is simply too much of a reach to contend that Myles would get a speedier trial in Florida than in this Court.  Indeed, it is more likely that the opposite is true. First, there is no guarantee that this matter, if transferred, would not be assigned to a judge who, for whatever reason, could not accommodate an early trial date.  Additionally, newly appointed defense counsel would have to duplicate the time already spent by defense counsel in New York to become familiar with defendant's case, and documents and discovery would have to be shipped to Florida, all of which does not bode well for a speedy trial in the event of transfer. Lastly, the table cited by Myles in support of his argument for docket congestion reveals that the Southern District of Florida had more criminal filings in 2005 and 2006, than did the Southern District of New York.  See http://www.uscourts.gov/caseload2006/tables/D00CMar06.pdf.  In 2005 and 2006, the SDFL had 1,620 and 1,513 criminal filings, while during the same period the SDNY had 1,254 and 1,126 criminal filings.  Thus, even the statistics cited by the defendant reveal that this district is better equipped to handle this case.

In any event, Myles certainly has not met his burden in showing that this Platt factor weighs in favor of transfer.

**10.    Special Conditions**

Myles has also not addressed any special conditions that warrant the transfer of this matter to the Southern District of Florida.  In any event, while the point has been raised above, it is worth repeating that Myles is presently incarcerated on unrelated federal charges, and will be so incarcerated for the next five years.  Accordingly, many of the policies that ordinarily weigh in favor of transfer to a defendant's home state – such as expense to the defendant and interference with the defendant's daily activities and family responsibilities in having to defend a

case in a different jurisdiction – are simply inapplicable here.

**C.**    **Conclusion**

Defendant Myles has failed to satisfy his burden of proving that the interests of justice favor transfer of this case to Florida.  Of the ten <u>Platt</u> factors, none favors transfer, while at least three – location of witnesses, expense to the Government, and the location of counsel, weigh against transfer.  The remaining <u>Platt</u> factors are neutral regarding transfer.

Under these circumstances, and in light of courts' strong presumption and policy that cases should be brought in the district in which they were filed absent compelling reasons, defendants' motion to transfer venue should be denied.

Dated:  New York, New York
        October 9, 2007

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:_____/s/_____
        CHRISTOPHER L. LAVIGNE
        JENNIFER G. RODGERS
        Assistants United States Attorney
        (212) 637-2325/2513