Approved: _Clavigne_  07 MAG    588
SCOTT L. MARRAH
CHRISTOPHER L. LAVIGNE
Assistant United States Attorneys

Before:  HONORABLE DOUGLAS F. EATON
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :    SEALED COMPLAINT
                                      :
           - v -                      :    Violation of
                                      :    18 U.S.C. § 371
                                           & 22 U.S.C. § 2778
LAWRENCE DAVIS,                       :
     a/k/a "Larry Davis,"
GEORGE FRANK MYLES, Jr.,
     a/k/a "George Miles,"            :    COUNTY OF OFFENSE:
GWENDOLYN DOUGLAS,                    :    NEW YORK
     a/k/a "Gwen Douglas,"

                Defendants.

- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MARCOS R. CASTRO, being duly sworn, deposes and says that
he is a Senior Special Agent with the United States Department of
Homeland Security, Immigration and Customs Enforcement ("ICE"), and
charges as follows:

## COUNT ONE

### (Conspiracy to Violate the Arms Export Control Act ("AECA"))

        1.    From at least in or about April 2005, up to and
including the present, in the Southern District of New York and
elsewhere, LAWRENCE DAVIS, a/k/a "Larry Davis," GEORGE FRANK MYLES,
Jr., a/k/a "George Miles," and GWENDOLYN DOUGLAS, a/k/a "Gwen
Douglas," the defendants, and others known and unknown, unlawfully,
willfully, and knowingly did combine, conspire, confederate, and
agree together and with each other to commit offenses against the
United States, to wit, to violate Title 22, United States Code,
Section 2778.

        2.    It was a part and an object of the conspiracy that
LAWRENCE DAVIS, a/k/a "Larry Davis," GEORGE FRANK MYLES, Jr., a/k/a
"George Miles," and GWENDOLYN DOUGLAS, a/k/a "Gwen Douglas," the
defendants, and others, known and unknown, unlawfully, willfully,
and knowingly, would and did export, and cause to be exported, from

the United States to a co-conspirator not named as a defendant herein ("CC-1"), located in Dubai, United Arab Emirates ("UAE"), defense articles listed on the United States Munitions List ("USML"), to wit, _inter alia_, military aviation parts for the F-14 military fighter jet, without having first obtained from the United States Department of State, Directorate of Defense Trade Controls, a license, or other written authorization, for such export, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and regulations promulgated thereunder (Title 22, Code of Federal Regulations, Sections 120.6, 120.17, 120.20, 121.1 (category VIII(h)), 123.1, and 127.1).

### Overt Acts

3. In furtherance of the charged conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about July 19, 2005, July 21, 2005, July 28, 2005, September 9, 2005, and December 13, 2005, GEORGE FRANK MYLES, Jr., a/k/a "George Miles," the defendant, through his company MILES AVIATION, a/k/a "Myles Aviation," supplied LAWRENCE DAVIS, a/k/a "Larry Davis," the defendant, with military aviation parts designated as defense articles on the USML, including, _inter alia_, parts for the F-14 military fighter jet.

b. In or about November 2005, GWENDOLYN DOUGLAS, a/k/a "Gwen Douglas," the defendant, engaged in email correspondence with another co-conspirator and associate of CC-1 not named as a defendant herein ("CC-2"), about orders for military aviation parts designated as defense articles on the USML, including, _inter alia_, parts for the F-14 military fighter jet.

c. On July 28, 2005, August 9, 2005, November 14, 2005, February 7, 2006, and February 20, 2006, LAWRENCE DAVIS, a/k/a "Larry Davis," the defendant, through his company EXTREME EYEWEAR, a/k/a "Extreme Eyeware," shipped military aviation parts designated as defense articles on the USML, including, _inter alia_, parts for the F-14 military fighter jet, to CC-1 and CC-1's purported company, in Dubai, UAE.

(Title 18, United States Code, Section 371.)

4. The bases for my knowledge and for the foregoing charges are, in part, set forth in the attached Affidavit of Senior Special Agent Sean Willman, in Support of Search Warrants, which is incorporated by reference herein.

WHEREFORE, deponent prays that the above-named individuals be arrested, and imprisoned or bailed, as the case may be.

MARCOS R. CASTRO
SENIOR SPECIAL AGENT
U.S. DEPARTMENT OF HOMELAND SECURITY
IMMIGRATION AND CUSTOMS ENFORCEMENT


Sworn to before me this
11th day of April, 2007.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK


DOUGLAS F. EATON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ FLORIDA

**In the Matter of the Search of**
(Name, address or brief description of person, property or premises to be searched)
2521 Northwest 16th Lane, Bay E,
Pompano Beach, FL 33064

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: *07-6148-*
                    *SNOW*

I, _Sean Willman_____ being duly sworn depose and say:

I am a(n)  _Special Agent , Immigration and Customs Enforcement (ICE)_____ and have reason to believe
                                                          Official Title
that  ☐ on the person of or    ☑ on the property or premises known as (name, description and/or location)
2521 Northwest 16th Lane, Bay E, Pompano Beach, FL 33064

in the  _SOUTHERN_____ District of _____FLORIDA_____
there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attachment "A"

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
fruits, evidence, and instrumentalities of a crime against the United States

concerning a violation of Title _22_____ United States code, Section(s) _2778 and 18 USC 371_____
The facts to support a finding of probable cause are as follows:
See Attached Affidavit

Continued on the attached sheet and made a part hereof:    ☑ Yes    ☐ No

_Sean Willman_____
Name of Affiant

Signature of Affiant

Sworn to before me and subscribed in my presence,

_APRIL  11  2007_____    at   _Ft. Lauderdale_____   _Florida____
Date                                                            City                                          State

_Hon. Lurana S. Snow_____  _U.S. Magistrate Judge__
Name of Judge                       Title of Judge                      Signature of Judge

AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF ___ FLORIDA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)
2373 Southeast 14th Street
Pompano Beach, FL 33062

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number: _07-6147 - SNOW_

I, __Sean Willman_____ being duly sworn depose and say:

I am a(n) __Special Agent , Immigration and Customs Enforcement (ICE)_____ and have reason to believe
                                                              Official Title

that ☐ on the person of or   ☑ on the property or premises known as (name, description and/or location)
2521 Northwest 16th Lane, Bay E, Pompano Beach, FL 33064

in the __SOUTHERN_____ District of ___FLORIDA_____

*there is now concealed a certain person or property, namely* (describe the person or property to be seized)
See Attachment "A"

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
fruits, evidence, and instrumentalities of a crime against the United States

concerning a violation of Title __22_____ United States code, Section(s) __2778 and 18 USC 371__

The facts to support a finding of probable cause are as follows:
See Attached Affidavit

Continued on the attached sheet and made a part hereof:     ☑ Yes    ☐ No

Sean Willman
_____
Name of Affiant                                          Signature of Affiant

Sworn to before me and subscribed in my presence,

_APRIL 11 2007_
_____          at   Ft. Lauderdale                    Florida
Date                                                                      City                                      State

Hon. Lurana S. Snow          U.S. Magistrate Judge
_____          _____
Name of Judge                    Title of Judge                    Signature of Judge

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

SEAN WILLMAN, being duly sworn, deposes and says that he is a Senior Special Agent of United States Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security.

Upon information and belief, there is probable cause to believe that located inside THE PREMISES KNOWN AS (1) 2521 NORTHWEST 16th LANE, BAY E, POMPANO BEACH, FLORIDA (the "MILES AVIATION PREMISES"), AND (2) 2373 SOUTHEAST 14th STREET, POMPANO BEACH, FLORIDA (the "EXTREME EYEWEAR PREMISES") there exists evidence, instrumentalities and fruits of violations of Title 22, United States Code, Section 2778, which makes it a crime to willfully export any defense articles listed on the United States Munitions List, Title 22, Code of Federal Regulations, Section 121.1, without a license for such export; conspiracy to commit this offense in violation of 18 U.S.C. § 371; and other laws.

The sources of my information and the grounds for my belief are as follows:

**I.     Introduction**

1.      I am and have been a Senior Special Agent of United States Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security, for approximately four years. I am currently assigned to the Arms and Strategic Technology Investigations group ("ASTI"). My duties include investigating violations of, and conspiracies to violate, the Arms Export Control Act, 22 U.S.C. §§ 2751-2799aa-2 (the "AECA").      Prior to becoming an ICE Special Agent, I was a Special Agent with the U.S. Department of State, Diplomatic Security Service for four years. As part of my training to become a Special Agent with ICE, I received 3 months of instruction in Customs and Immigration laws. Through my training and

experience, I have become familiar with the manner in which military articles and other materials are illegally obtained, purchased, sold, transported, and exported, and the methods of payment for such contraband. Through my training and experience, I have learned that individuals and companies that export items maintain records of these transactions for an extended period of time at their place of business. In fact, pursuant to the Export Administration Regulations, exporters are required to keep certain records at least five years. (See 15 C.F.R. § 762).

2.     I am presently involved in an investigation of the following individuals and entities, among others, for, inter alia, conspiring to violate the Arms Export Control Act: EXTREME EYEWEAR LLC, a/k/a Extreme Eyeware ("EXTREME EYEWEAR"), LAWRENCE DAVIS, a/k/a Larry Davis ("LAWRENCE DAVIS"), MILES AVIATION, Inc., a/k/a Myles Aviation, Inc. ("MILES AVIATION"), GEORGE MYLES, and GWENDOLYN DOUGLAS, a/k/a "Gwen Douglas" (GWENDOLYN DOUGLAS"). Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to search the MILES AVIATION PREMISES and the EXTREME EYEWEAR PREMISES. In addition, the information contained in this Affidavit is based upon information provided by other law enforcement officers and others, as well as my personal observation and knowledge. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part only.

3.     Based on my training and experience, as well as on information provided by other law enforcement officers, I am familiar with the practices and methods of persons committing export-related crimes. Based on those sources, and on the facts set forth below, there is probable

cause to believe that the MILES AVIATION PREMISES and the EXTREME EYEWEAR PREMISES contain evidence, instrumentalities and fruits of violations of 22 U.S.C. Section 2778, willfully exporting any defense articles listed on the United States Munitions List, Title 22, Code of Federal Regulations, Section 121.1, without a license for such export; conspiracy to commit this offense in violation of 18 U.S.C. § 371; and other laws, as well as other items described in Attachment A, appended hereto.

**II.    Statutory Provisions**

4.      Title 22, United States Code Sections 2751, et seq., is known as the Arms Export Control Act or "AECA." Section 2778 empowers the president to regulate the export from, and import into, the United States, of "defense articles" and "defense services."

a.      "Defense articles" are items that are specifically designed, developed, configured, adapted, or modified for a military application. Title 22, Code of Federal Regulations, Part 120, known as the International Traffic in Arms Regulations (the "ITAR") authorizes the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), to determine the particular defense articles that constitute the United States Munitions List (the "USML"). Such final determinations are not subject to judicial review.

b.      If an item falls on the USML, it may not be exported from, or imported into, the United States without a valid license issued by the U.S. Department of State, see 22 U.S.C. § 2778(b)(2), unless certain limited regulatory exceptions apply. An applicant for an export or import license from the State Department must identify in the required license application the ultimate and final destination of the goods, which in the trade is referred to as the "end user."

c.      In addition, if an individual or entity is "in the business of"

manufacturing, exporting, or importing any defense articles or defense services on the USML, it must register with the State Department. See 22 U.S.C. § 2778(b)(1)(A)(i). A similar requirement applies to companies that engage in brokering activities with respect to the manufacture, export, import, or transfer of any defense articles or services. See 22 U.S.C. § 2778(b)(1)(A)(ii)(I).

    d. A willful violation of any of these statutory provisions, or any regulations promulgated thereunder, is a felony.

### III. Description of the MILES AVIATION PREMISES and EXTREME EYEWEAR PREMISES

    5. The MILES AVIATION PREMISES is an office building located at 2521 Northwest 16th Lane, Bay E, in Pompano Beach, Florida. It is located North of Copans Road in the Copans Road Industrial Park on Northwest 16th Lane, at the end of a dead end road, on the North-west side of Northwest 16th Lane, in an industrial "L" shaped complex. The MILES AVIATION PREMISES is in a single story office building that is yellow in color. The front side, facing South, has a double door, a single door and a single garage door, all pink in color. I have conducted surveillance at the MILES AVIATION PREMISES.

    6. The EXTREME EYEWEAR PREMISES is located in a residential building, a domicile owned by LAWRENCE DAVIS and located at 2373 Southeast 14th Street, in Pompano Beach, Florida . The EXTREME EYEWEAR PREMISES is a single story house located in Pompano Isles 27-15B, Lot 52, Block 1. The EXTREME EYEWEAR PREMISES is located on a cul-de-sac to the East of US 1 (Federal Highway) and is the twelfth house East of SE 22nd Avenue on the North side of Southeast 14th Street. It is off-white in color, with light blue trim, a red tile roof, a semi-covered carport and a semi-circular driveway. Tropical and sub-tropical fauna surrounds the

EXTREME EYEWEAR PREMISES and partially obscure it from view. I have conducted surveillance of the EXTREME EYEWEAR PREMISES.

## IV. The Investigation

7.      Since in or about the spring of 2004, I have been involved in the investigation of attempts by United States military parts suppliers to provide a co-conspirator not named as a defendant herein ("CC-1"), a suspected Iranian national, with military parts, including aviation parts, in violation of the AECA. CC-1 has repeatedly contacted United States military parts suppliers by email and requested that they export such parts to him overseas to his purported company, a co-conspirator not named as a defendant herein ("CC-COMPANY"), in Dubai, United Arab Emirates ("UAE"). Based on information set forth below, it is believed that CC-1's true company and customers are located in Iran and that CC-1 is providing these Iranian customers with a wide array of military parts obtained from United States suppliers, in violation of the AECA.

8.      During the course of this investigation, I also learned that another co-conspirator, not named as a defendant herein ("CC-2"), who identified himself as a purported associate of CC-1, has also been actively trying to obtain United States military parts and arrange for their delivery overseas. CC-2 has contacted these domestic military parts suppliers regularly by email. Analysis of internet protocol data associated with CC-1's and CC-2's "log ins" to their email accounts suggest that CC-1 and CC-2 may in fact be the same person.[1]

9.      In or about February of 2006, my law enforcement group (ASTI) obtained

---

[1]      For ease of reference, and because they present themselves as distinct individuals, CC-1 and CC-2 are addressed separately in this affidavit.

DHL documents reflecting fifteen shipments that were sent via DHL to CC-1 or CC-COMPANY in Dubai, UAE, from EXTREME EYEWEAR, located at the EXTREME EYEWEAR PREMISES in Pompano Beach, Florida. As set forth below, certain of these shipments contained USML items.[2] I have personally reviewed these DHL documents, have spoken with DHL representatives, and have learned the following information about these shipments:

        a.   CC-1 was listed as the consignee or receiver on DHL records for ten of these shipments, and CC-COMPANY, or a variation of its name, was listed as the consignee or receiver for the remaining five. Even shipments addressed to the CC-COMPANY, however, were directed to the attention of CC-1 and bore the same address as those sent to CC-1 - namely an address in Dubai, UAE.

        b.   DHL records further reveal that "L. Davis" was listed as the sender for these shipments, underneath "Extreme Eyeware." Lexis-Nexis searches have revealed that "Larry Davis" is listed as the contact person at EXTREME EYEWEAR and the address is listed as the EXTREME EYEWEAR PREMISES. On April 5, 2007, I confirmed the above information and the business was listed in an active status. On April 6, 2007, I visited the EXTREME EYEWEAR website and it was also active and functioning for business.

        c.   The relevant DHL documents pertaining to

---

[2]    In addition, on or about February 16, 2006, the Department of Transportation, Federal Aviation Administration ("FAA"), in conjunction with the Defense Criminal Investigative Service ("DCIS"), executed a search warrant at the MILES AVIATION PREMISES which resulted in the indictment and conviction of GEORGE MYLES on aircraft parts fraud charges, for which he was recently sentenced to 78 months' imprisonment. Documents obtained from this search confirm the information obtained from DHL. As discussed below, MYLES and GWENDOLYN DOUGLAS continued to operate his aviation supply business from the MILES AVIATION PREMISES from February 16, 2006 to the present.

these shipments from EXTREME EYEWEAR at the EXTREME EYEWEAR PREMISES to CC-1 and CC-COMPANY (located in Dubai) revealed the following information about the dates of shipment, the shipper's description of the items sent, and the shipper's declared value of the shipments:

| Date | Description of Item | Declared Value |
|---|---|---|
| 2/20/06 | Valve | $75.00 |
| 2/7/06 | 5 Sample Parts | $205.00 |
| 12/13/05 | Acclerometer Sample Repla | $25.00 |
| 12/5/05 | Acceleromet | $25.00 |
| 11/14/05 | Parts 9 Samples | $140.00 |
| 10/14/05 | Sample Parts | $30.00 |
| 9/29/05 | Parts Samples | $60.00 |
| 9/29/05 | Parts Samples | $60.00 |
| 9/19/05 | Sample Parts | $75.00 |
| 8/31/05 | Aviation Parts | $150.00 |
| 8/9/05 | Sample Parts | $150.00 |
| 7/28/05 | Parts Samples | $150.00 |
| 6/17/05 | Eyewear 100 Sample Gage | $2200.00 |
| 4/28/05 | Sunglasses | $4840.00 |

d.      At least one additional shipment was sent from EXTREME EYEWEAR to CC-1 on or about December 19, 2005. The contents of this shipment were listed on the DHL airbill as "sample switch," with a declared value of $25.00. A review of DHL records indicates that the intended recipient of this shipment (CC-1) refused delivery in Dubai, on or about December 27, 2005. DHL records reveal that the DHL office in Tehran, Iran, then made

arrangements for the package to be delivered to CC-1, in Tehran, Iran. This shipment was subsequently delivered to Iran on or about December 29, 2005, and appears to have been signed for by a name that appears to be a slight variation of the name used by CC-1.

     e.  In connection with these shipments, EXTREME EYEWEAR provided DHL with purported copies of invoices that it submitted to CC-1 and CC-COMPANY regarding the contents of these shipments. Thus far, DHL has provided ASTI with seven invoices it received from EXTREME EYEWEAR, all of which I have reviewed. Five of these invoices were billed to CC-COMPANY, and two were directly billed to CC-1. The invoices list the following information regarding these orders:

| Date | Item Number | Description | Quantity | Rate | Amount |
|------|-------------|-------------|----------|------|--------|
| 2/20/06 | a51e9203-3 | Valve Oxygen repair | 1 | 75.00 | 75.00 |
| 2/7/06 | P6-20055 | switch used sample | 3 | 25.00 | 75.00 |
|  | 10AT328-1 | Switch used sample | 1 | 90.00 | 90.00 |
|  | a51e9203-3 | Valve oxygen sample no new | 1 | 40.00 | 40.00 |
| 12/13/05 |  | acclerometer sample replacement | 1 | 25.00 | 25.00 |
| 11/14/05 | 10AT328-1 | Switch | 2 | 25.00 | 50.00 |
|  | 1620660-1 | Valve assy | 1 | 40.00 | 40.00 |
|  | M81511-56FB | Connector | 2 | 10.00 | 20.00 |
|  | M81511-56FE | Connector | 2 | 10.00 | 20.00 |
|  | 1211-013 | Connector | 1 | 5.00 | 5.00 |
|  | 140414 | Gasket | 1 | 5.00 | 5.00 |

| Date | Item Number | Description | Quantity | Rate | Amount |
|------|-------------|-------------|----------|------|--------|
| 8/9/05 | 1510010200-1 | Valve regulator | 3 | 50.00 | 150.00 |
| | 47291 | Sample Valve | 1 | 0.00 | 0.00 |
| | 10328 | sample switch | 1 | 0.00 | 0.00 |
| | A51E9203-1 | Valve regulator sample | 1 | 0.00 | 0.00 |
| 7/28/05 | 18150907 | Gage Pressure Sample | 4 | 25.00 | 100.00 |
| | 1510010200-1 | Valve regulator sample | 1 | 25.00 | 25.00 |
| | 1263-1 | Dummy Converter Sample | 1 | 25.00 | 25.00 |
| 6/16/05 | OP52G/BA/TC | 52mm Gold Original Pilot Sunglasses Bayonet Temples / True Color grey # 3 lense | 100 | 22.00 | 2,200.00 |
| | GAGE | SAMPLE GAGE | | 0.00 | 0.00 |

10.     I have communicated with DDTC regarding the contents of the shipments referenced above. DDTC has since provided ASTI with pre-trial certifications that parts a51e9203-3, P6-20055, 10AT328-1, 1620660-1, A51E9203-1, 18150907, 1263-1, and 1510010200-1 fall on Article VIII(h) of the USML, which includes:

> Components, parts, accessories, attachments, and associated equipment (including ground support equipment) specifically designed or modified for the articles in paragraphs (a) through (e) of this category, excluding aircraft tires and propellers used with reciprocating engines.

22 C.F.R. § 121.1.[3] I have reviewed information from the manufacturer that indicates that parts a51e9203-3, P6-20055, 10AT328-1, A51E9203-1, 18150907, and 1510010200-1 are used for the

---

[3]     DDTC's pre-trial certifications for two of these parts (18150907 and 1263-1) were based upon "alternate" part numbers used by manufacturers to describe those two parts that were shipped by DAVIS. It also appears that part "10328" is a reference to "10AT328," which falls on the USML.

-9-

F-14 military fighter jet. The articles referenced in paragraphs (a) through (e) of Section 121.1 include: aircraft which are specifically designed, modified, or equipped for military purposes; military aircraft engines; cartridge-actuated devices utilized in emergency escape of personnel and airborne equipment; launching and recovery equipment; and inertial navigation systems. Accordingly, in order for the aforementioned shipments—all of which contained parts falling on the USML—to be sent overseas, the shipper needed a valid State Department license. See 22 U.S.C. § 2778(b)(2). ASTI is awaiting determination as to whether part 47291 (sent as part of the August 9, 2005 shipment) falls on the USML. DDTC has also informed ASTI that parts M81511-56FB02S1 (connector), M81511-56FE01S1 (connector), 1211-013 (connector), and 140414 (gasket) (sent as part of the November 14, 2005 shipment) are used for the F-14 or other military aircraft, but may also be used in other civil applications. Accordingly, ASTI is presently awaiting confirmation from the United States Department of Commerce as to whether a license was needed for these parts to have been exported.[4]

       11.    Given the fact that ASTI has confirmed that at least eight parts shipped from EXTREME EYEWEAR to CC-1 from July 2005 until February 2006 are listed on Article VIII(h) of the USML  (and at least six of which are F-14 military fighter jet parts), EXTREME EYEWEAR sent at least five shipments of USML items to CC-1 in Dubai, UAE, without an appropriate export license. According to DDTC, neither EXTREME EYEWEAR nor

---

    [4]    Where certain items have "dual use" capabilities, the United States Department of Commerce may require a separate license to export such items. Failure to comply with these Commerce regulations may also result in criminal liability. In addition, part 140414 appears to refer to a number of categories of parts, some of which may fall on the USML. ASTI is continuing to investigate whether this specific part shipped by EXTREME EYEWEAR falls on the USML.

LAWRENCE DAVIS ever applied for, or received, an export license from the United States Department of State to ship any USML parts overseas, let alone the parts referenced above.

      12.    Based on my review of records from the Federal Reserve Bank of NY and from Bank Atlantic (at which the account for EXTREME EYEWEAR is held), and based on my discussions with employees of these entities, I have also learned the following:

      a.    From September 2005 until February 2006, CC-1 made at least eight monetary wire transfers to a Bank Atlantic account, held in the name "Extreme Eyewear LLC." Among other things, Bank Atlantic and the Federal Reserve Bank of NY provided me with information pertaining to the "reference for the beneficiary" ("RFB") and "originator to the beneficiary" ("OBI") fields for these transactions. Employees of the Federal Reserve Bank of NY have informed me that the RFB and OBI information is provided by the individual who initiates the wire transfer. CC-1's name, or a variation thereof, appears in the RFB field in all of these transfers. In addition, in a majority of the transfers, the sender indicated in the OBI field that the wire transfers were for sunglasses.[5]

      b.    These transactions originated by CC-1 at Sawan Exchange Co. LLC, located in Dubai, UAE, from where the funds were transferred, via Emirates Bank International, to EXTREME EYEWEAR's Bank Atlantic account, via Deutsche Bank Trust Company Americas, based in Manhattan and the Federal Reserve Bank of New York.

      c.    The approximate dates and amounts of these transfers, are as follows:

---

[5]    As indicated below, I believe that, even though the sender indicated that the transfers related to purchases of "sunglasses," the transfers in fact related to EXTREME EYEWEAR's shipment of restricted USML items to CC-1. Accordingly, I believe that CC-1's descriptions of the purpose of the transfers in the OBI field, (i.e. sunglasses) are, at least in part, false.

| Date | Amount of Transfer | OBI |
|---|---|---|
| 2/6/06 | $6300.00 | FOR SUNGLASSES |
| 1/5/06 | $950.00 | SUNGLASSES |
| 12/13/05 | $700.00 | |
| 11/28/05 | $2750.00 | FOR SUNGLASSES |
| 10/20/05 | $2100.00 | SUNGLASSES |
| 10/11/05 | $3800.00 | FOR SUNGLASSES |
| 9/23/05 | $7500.00 | SUNGLASSES |
| 9/8/05 | $6925.00 | |

13.    Invoices obtained from the FAA's search of MILES AVIATION (along with email correspondence summarized below) indicate that MILES AVIATION supplied EXTREME EYEWEAR with a number of the USML parts it sent to CC-1 and CC-Company. I have reviewed these invoices, which reflect the following information regarding the dates of purchase, items purchased, and the amounts MILES AVIATION charged EXTREME EYEWEAR:

| Date | Item Number | Description | Quantity | Rate | Amount |
|---|---|---|---|---|---|
| 12/13/05 | 656310 | Accelerometer | 1 | $2275.00 | $2275.00 |
| 9/30/05 | 604900-3<br>A51E9203-3<br>A51M9022-5 | Gyro<br>Oxygen Valve<br>Shaft | 1<br>1<br>1 | $5625.00<br>$75.00<br>Order in<br>Question | $5625.00<br>$75.00 |
| 7/28/05 | 1510010200-1<br>18150907<br>1263-1 | Valve<br>Gage<br>Converter | 1<br>4<br>1 | $750.00<br>$450.00<br>$375.00 | $750.00<br>$1800.00<br>$375.00 |
| 7/21/05 | 1510010200-1<br>18150907 | Valve regulator<br>Gage pressure | 1<br>1 | $750.00<br>$450.00 | $750.00<br>$450.00 |

-12-

| Date | Item Number | Description | Quantity | Rate | Amount |
|------|-------------|-------------|----------|------|--------|
| 7/19/05 | 1510010200-1 18150907/A51H9029-1 | Valve Regulator Pressure Gage | 1 4 | $750.00 $450.00 | $750.00 $1800.00 |

Parts referenced in these invoices (656310, A51E9203-3, 1510010200-1, 18150907, and 1263-1) were, as indicated above, sent by EXTREME EYEWEAR to CC-1 and CC-COMPANY. The search of MYLES AVIATION also recovered a May 31, 2005 quotation from MILES AVIATION to CC-2 in the amount of $131,050.00 for part numbers: 26N1278; 1510010200; 18150907; and 1620660-1.

14.    In obtaining these parts from EXTREME EYEWEAR, both CC-1 and CC-2 communicated with certain individuals relevant to this investigation.    Some of these communications are summarized as follows:

a.    **In a September** 30, 2005 email from CC-1 to DAVIS, CC-1 noted that "my assistance [CC-2] always check the avialability [sic] of parts with Gwen and other sources and then I ask you to purchase them." Based on my investigation, I know that the reference to "Gwen" is to that of GWENDOLYN DOUGLAS, an employee of MILES AVIATION, who is in frequent contact with CC-2.

b.    A November 7, 2005 email from CC-2 to "Gwen" at milesaviation@aol.com specifically asked MILES AVIATION to "contact with Mr. Larry Davis for the following parts," which included:

1-One Valve Assy. P/N 1620660-1
2-Two Connector P/N M81511-56FB02S1
3-Two Connector P/N M81511-56FE01S1
4-One Connector P/N 1211-013
5-One Gasket P/N 140414
6-One NSN 6610-00-001-1792

-13·

All of these parts (with the exception of the last) appear to correspond to those found on the November 14, 2005 invoice from EXTREME EYEWEAR to CC-COMPANY, the contents of which were shipped from EXTREME EYEWEAR to CC-1 in Dubai, UAE on or about the same date.[6]

        c.     GWENDOLYN DOUGLAS responded to this email and wrote: "[CC-2], [d]id you need 10at328-1 switch Qty 2 that was on that list on last week, please let me know." This part was also referenced on the November 14, 2005 invoice from EXTREME EYEWEAR to CC-COMPANY. CC-2 responded on November 11, 2005: "Dear Gwen [p]lease inform me the status of present order a.s.a.p. Look forward hearing from you." DOUGLAS replied "Larry, will pick-up your order today," to which CC-2 responded: "I do appreciate your business. I hope that Larry can pick up the order completely."

        d.     In another email, dated in or about late November 2005, CC-2 informed DOUGLAS that "we will place an order for Accelerometer P/N 656310 ($2275)," to which DOUGLAS responded by email on December 1, 2005: "I have the Purchase Order for Extreme Eyeware." CC-2 subsequently emailed DOUGLAS and asked "[w]hen will you deliver the Accelerometer P/N 656310," to which DOUGLAS responded "Dear [CC-2], 656310 Acclerometer is here I will call Larry to pick it up." As noted, EXTREME EYEWEAR described the contents of its December 5 and 13, 2005 shipments to CC-1 as "Acclerometer Sample Repla"

---

[6]     According to records obtained from AOL, "George Myles" is listed as the billing person for the account milesaviation@aol.com, with an address of 929 Coral Club Drive. Based on a review of MILES AVIATION's documents, such as invoices, I know that GEORGE MYLES is the owner of MILES AVIATION. I have also learned that another email account, mylesaviation@yahoo.com, is associated with this business. A review of yahoo records reveals that the contact person for this account is GEORGE MYLES, located in Pompano Beach, Florida, with a billing address of 2521 NW 16th Lane Bay, Pompano Beach, Florida.

and "Acceleromet." DDTC has provided ASTI with pre-trial certification that this part (i.e. 656310) falls on the USML.

        e.     In another series of emails between CC-2 and DOUGLAS, the two communicate about how certain parts that CC-2 purchased are defective. In one email dated October 8, 2005, for example, CC-2 wrote to DOUGLAS that "one Sensor Cooling P/N A51E9040-1 (AR) & two Valve Regulator P/N LH 1490-5 found in-operative & after test, so we will send them for returne. [sic]." In a subsequent email, DOUGLAS wrote to CC-2 that "the valve regulator is the correct part with the same national stock number . . . tracing it back to the L1490-5 just made by a different manufacturer. We gave Larry the back paper work showing it was the correct part." CC-2 then wrote in an email on October 15, 2005, that "[t]hose two Valve P/N LH1490-5 was WRECK! They have LEAKAGE and was rejekted [sic] after test. I know that P/N LH1490-5 is alternate part for P/N 1510010200-1 but customer believes that 1510010200-1 is better than LH1490-5 and prefer it."

        f.     It also appears that LAWRENCE DAVIS pasted an earlier email from CC-1 into an October 6, 2005 email to GWENDOLYN DOUGLAS The bottom of the email reads: "Gwen here is the latest from [CC-1][.] Thank you[,] Larry." The top of the email reads:

> Dear Larry
>
> Please be aware that I sent you those two Switch P/N HL7115-33 for refund with DHL airbill # 1542652580. About S1496-1 please purchase a part with any description and I will check it here. Gwen informed me that the price is 100$ so not so expensive. About Shaft as I told you before, I am not going to insist on this part and you can replace it by Accumulator P/N A51H9103-1. But the latest information from customer is that this part in [sic] ordered by US NAF Atsugi base in Japan. Looking forward hearing latest information from you.

Regards
[CC-1].

DDTC has provided ASTI with pre-trial certifications that parts HL7115-33 and S1496 fall under Article VIII(h) of the USML. In addition, I have reviewed DHL records pertaining to airbill number 1542652580. According to these records, a shipment bearing this airbill number was sent by CC-1 at CC-COMPANY to "Larry" at EXTREME EYEWEAR on or about October 6, 2005, and was delivered on or about October 10, 2005, and signed for by "L. Davis." The shipper described the contents of the package as "sampes [sic] switch."

       g.     LAWRENCE DAVIS sent an email on or about December 19, 2006, responding to an "urgent" order from CC-1 purportedly regarding sunglasses asking for additional information and a shipping date to send the materials to CC-1.

       15.     Based on my review of emails and other documents, it also appears that CC-1 and CC-2 are dealing directly with MILES AVIATION and other suppliers to obtain military parts. Records obtained from DHL and United States Customs and Border Protection ("CBP") show that MILES AVIATION recently sent shipments to Dubai, UAE on December 20, 2006, January 15, 2007, January 17, 2007, February 5, 2007, and February 15, 2007. The person to whom these packages are sent is listed as a different name, a co-conspirator not charged as a defendant herein ("CC-3"), and these packages are addressed to essentially the same address used by DAVIS in sending shipments to CC-1/CC-COMPANY.

       16.     Moreover, I have reviewed commercial invoices that were submitted to DHL in connection with these recent shipments. These invoices bear the following information, including specific references to CC-2's first name:

-16-

| Date | Consignee | Export Reference | Description of Goods | Quantity | Unit Value | Subtotal |
|---|---|---|---|---|---|---|
| 2/15/07 | [CC-3] | [CC-2 1st Name]-0012 | Seals | 83 | 10.00 | 830.00 |
| 2/5/07 | [CC-3] | [CC-2 1st Name]-0011 | Packing Packing Kit | 64 100 1 | 4.00 2.00 480.00 | 256.00 200.00 480 |
| 1/17/07 | [CC-3]. | [CC-2 1st Name]-0015 | Packing Bracket | 2 1 | 4.00 50.00 | 8.00 50.00 |
| 1/15/07 | [CC-3] | [CC-2 1st Name]-0010 | Packing Packing Bracket | 8 40 2 | 4.00 2.00 50.00 | 32.00 80.00 100.00 |
| 12/18/06 | [CC-3] | [CC-2 1st Name]-GWEN | Aircraft Parts -Light Assy -Converter -Seal | 4 2 4 | 5.00 25.00 15.00 | 20.00 50.00 60.00 |

Based on my training and experience in this investigation, I believe that: (1) the descriptions of the items shipped are references to aviation parts, some of which required export licenses prior to being shipped overseas; and (2) the amounts of these goods were significantly undervalued.[7]

17.    Emails obtained from a search warrant of a MILES AVIATION email account and other email accounts corroborate the above shipments and dealings between MILES AVIATION and CC-2, as set forth below:

---

[7]    Based on my training and experience, I believe the reason for undervaluing these goods is likely to avoid the completion of Shipper's Export Declarations ("SEDs")—for exports exceeding $2500 in value or for those requiring an export license—which enables these parts to clear customs more easily and which allows CC-2 to pay reduced customs duties. See 15 C.F.R. § 758.1.    Among other things, SEDs request information relating to the parties of the relevant transaction; the description, quantity, and value of the items exported; and the license authority for the export. See id. SEDs are often filed electronically via the Automated Export System and are used, inter alia, by the Department of Commerce, Bureau of Census, to collect trade statistics and by law enforcement for export control purposes. See id.

-17-

a.    In a mid-December 2006 email response to CC-2, DOUGLAS wrote: "[t]hese are the parts that is ready to be ship and yes we can ship direct to your customers using you DHL account.  Below is the parts that are ready to be ship."  DOUGLAS listed the following part numbers:

> 02-91180-8 Light Qty 4 @ $25.00 = $100.00
> CA00KE24 Connector Qty 2 @ 240.00 = $480.00
> 100941 Seal Qty 4 @ $80.00 - $320.00 could supply a qty 5 more seal to total your $1300.00 credit.

Based on these parts' descriptions and quantities, I believe these represent the contents of the December 18, 2006 shipment referenced above, which refer to "aircraft parts."  Notably, however, the amounts set forth on that invoice are substantially lower than those set forth in this email.  DDTC has provided a "first level" determination that part 100941 (seals) fall on the USML and hence require an export license prior to being shipped.  ASTI has confirmed that MILES AVIATION has never obtained an export license, and has never successfully registered as an exporter or broker of USML items with the Department of State.[8]

b.    In a mid-December 2006 email, CC-2 requested that DOUGLAS ship the following "sample parts to ship together."  CC-2 then listed what appears to be a number of aviation parts and stated "I will arrange $1000 wire transfer to cover total order price."  Records obtained from the Federal Reserve Bank of New York show that on December 27, 2006, a wire transfer was made to MILES AVIATION's Wachovia Bank account from CC-3 via the Al Fardan Exchange in the amount of $1,235

---

[8]    MILES AVIATION attempted to register as a broker for USML aircraft parts with the Department of State on May 16, 2006, but its application was rejected as being incomplete. Notwithstanding this rejection, MILES AVIATION has continued to ship these parts.

        c.     In a mid-January 2007 email from GEORGE MYLES to CC-2, MYLES wrote "We kow [sic] of a company that ships parts to Saudi, UAE, Singapore and would like for you to contact them about shipping your parts," and then listed the company's name. CC-2 responded to this email and stated "[i]t is NOT the right answer to my question. . . . I CAN MANAGE MY ORDERS AND SHIPMENTS ON MY OWN. Please observe your OWN commitment. I STILL AWAIT CORRECT DHL AIRBILL # AS PER YOUR PREVIOUS DECLARATION." DOUGLAS responded to this email and stated that the company shipped the parts "this morning." DOUGLAS also explained that "ALL THE OWNER WAS TRYING TO EXPLAIN THAT HE DOES NOT HAVE EXPORT LICENSE TO KEEP SHIPPING PART TO U.A.E., HE WAS JUST TRYING TO HELP YOU OUT IN GIVING YOU INFORMATION OF A COMPANY THAT SHIP PARTS TO THOSE DIFFERENT LOCATION." MILES AVIATION nonetheless shipped this item and DOUGLAS provided CC-2 with the tracking number of the shipment that MILES AVIATION sent to CC-2.

        d.     Records obtained from DHL show that a shipment bearing the tracking number provided by DOUGLAS corresponds to that associated with the January 15, 2007 shipment referenced above, which was in fact delivered to Dubai, UAE on January 19, 2007. In a January 19, 2007 email, CC-2 wrote that "[CC-3] just called me and complaint about your recent shipment." CC-2 added in this email that "I ask you to ship 40ea Packing P/N 69494R242 + 8ea Packing P/N 53781 + 2ea Brackt 9-66512 and paid full payment for all." These descriptions and quantities directly correspond to the contents set forth on the January 15, 2007 invoice. Based upon my knowledge and experience in this investigation, I believe that these numbers correspond to aviation parts. A "first level" determination has concluded that part number "9-66512" is USML and

I have reviewed information from the manufacturer that indicates this part is used by, among others, the Iranian Islamic Air Force for its 707 Tanker aircraft. A "first level" review is pending from DDTC as to whether the remaining parts fall on the USML.

     e.  In a January 29, 2007 email to <u>milesaviation@aol.com,</u> CC-2 wrote to "Gwen" that he

> look[ed] forward your CONFIRMATION of my order with
> following details:
>
> 1- 64ea Packing P/N 537871 @ $40 each = $2560.00
> 2 - 100ea Packing P/N 69494R242 @ $3.75 each = $375.00
> 3 - 1ea Kit P/N 65-95534-3 @ $480 each - $480.00
> Sum = $3415.00
> Shipping & other charges = $135.00
> TOTAL = $3550.00
> As soon as I receive your confirmation for above order & estimated
> shipping date, I will arrange your $3550 wire transfer.

     f.  DOUGLAS responded to this email stating "your order will be ready for shipment on Friday 2/2/07." Subsequently, a January 31, 2007 email to CC-1 attached a receipt of a wire transfer of $3,560 to MILES AVIATION, drawn on the Wachovia Bank National Association, based in New York, in the amount of $3,560, via the Al Fardan Exchange. According to this receipt, the beneficiary was MILES AVIATION, and the transfer was to be drawn on Wachovia Bank National Association in New York, New York. The sender of the January 31, 2007 email appears to be an associate of CC-1 who owns or operates a trading company that remitted the transfer. A February 14, 2007 email from CC-1 was written in Farsi. The contents of this email have been translated, and the email reads: "Sorry, I apologize, my receiver is out of battery it turns off. I have no access to the FAX." The email then provides the bank account information for

MILES AVIATION and notes that they "have also made haval [meaning draft] to this account several times before."[9]

g.      A "Google" search revealed that the trading company referenced above is listed under the "Iranian Business Directory" in Dubai, UAE. As set forth above, the description (Packing and Kit) and quantities of these parts (64, 100, and 1) correspond exactly to those listed on the commercial invoice attached to MILES AVIATION's February 2, 2007 shipment to CC-3. The total value of these parts—as indicated in the parties' January 29, 2007 email and the January 31, 2007 wire transfer—is $3550. Nevertheless, MILES AVIATION—in accordance with the parties' agreement to undervalue shipments—declared the total value of the shipment to be $936.00.

h.      In early February 2007, DOUGLAS wrote to CC-2 that a specific part (3261132) apparently requested by CC-2 was a "military controlled item" such that the "end use country must be indicated in order to get price and delivery." CC-2 responded to "forget it" as he "should be more careful of [his] customers and their requests." Nonetheless, as set forth below, CC-2 continued to try and obtain USML parts, which MILES AVIATION has agreed to provide, notwithstanding its failure to obtain export licenses or successfully register with the Department of State.

i.      A February 2007 email to mileasaviation@aol.com from CC-2 asked the recipient to confirm a $6730 wire transfer and then added "[CC-3] just called me and told that one of your shipped packs contain 9ea Seal P/N 100941 instead of 10 ea, therefore he received

---

[9]      These and other translations referenced in this affidavit are preliminary and subject to modification.

total of 82eds Seal P/N 100941 instead of 83ea!?"  As noted above, DDTC's "first level"

determination" is that this part falls on the USML. In this same email, CC-2 wrote the following:

> Kindly be aware that we decide to order following parts. please let
> me know if you can ship them to destination or now.
> -Indicator Temp. P/N BH 183R58A to Dubai UAE
> -Valve P/N 3160130-3 to Bangkok - Thailand
> -Valve P/N 280986-0002 to Bangkok - Thailand
> -Oxygen Converter P/N 29073D2 or 21170-10 to Dubai or Kuala
> Lumpur Malaysia
> -Tank Liquid P/N 10C-0016-0035 to Dubai or Kuala Lumpur -
> Malaysia

A "first level" determination from DDTC indicates that parts 10C-0016-0035, 29073D2, BH

183R58A, and 280986-0002 fall on the USML and I have reviewed information from the

manufacturer that indicates that part 280986-0002 is used for the F-14 military fighter jet.

        j.    GWENDOLYN DOUGLAS responded to this email and stated that

MILES AVIATION did receive the $6730 wire transfer, and stated that it could send the requested

parts to the designated countries. A February 14, 2007 email to CC-1 attached a receipt of a $6730

wire transfer to MILES AVIATION via the Al Fardan Exchange in Dubai, UAE. According to this

receipt, the beneficiary was MILES AVIATION, and the transfer was to be drawn on Wachovia

Bank National Association in New York.

        k.    In a February 15, 2007 email, CC-2 inquired of DOUGLAS via

email as to whether she had shipped "83 ea Seal P/N 100941," to which DOUGLAS responded "will

ship today," and referenced the DHL airbill number in the email. Based on my review of DHL

records, I know that the airbill number referenced by DOUGLAS corresponds to that used for the

February 15, 2007 shipment summarized above. As referenced above, part 100941 falls on the

USML.

l.    In a February 20, 2007 email to "Gwen" at

mileasaviation@aol.com, CC-2 wrote:

> 1-Just spoken with [CC-3]. He told that count the seals several times BUT one of your vacuum bags was contain 9ea instead of 10.

> 2-[CC-3] thanks for your way of preparing INVOICES (he told you decrease the price in invoices) But ask me to Invoice total amount even more to under $200 for ease of custom clearance.

> 3-Those parts will order one by one and I ask your confirmation to calculate total price and charges for customers. At the moment I would like to begin with 3ea Indicator Temp. P/N BH183R58A for shipping to Dubai ([CC-3]).

m.    In a series of emails CC-2 discussed returning aviation parts to

MILES AVIATION based on the fact that the shipped parts were not satisfactory to CC-2's

customers. In an October 9, 2006 email for example, CC-2 wrote "customer DID NOT accept your

shipped Transformer P/N T61589 as they expect deliver of P/N 9T33Y6611. I asked them several

times to check the possibility of usage, but at last they declared that they are not interested in P/N

T61589." CC-2 further wrote "[a]s you did NOT inform me that you decide to ship alternative P/N

. . . I suppose that it is your own fault." On October 16, 2006, CC-2 wrote that "I am going to return

[part T61589] as you have shipped wrong part and I placed order for P/N 9T33Y6611." It appears

that in shipping this part from the United States, CC-2 used another U.S. company, a co-conspirator

not charged as a defendant herein ("CC-COMPANY 2"), as a conduit. In an October 31, 2006 email,

CC-2 wrote that "[CC-COMPANY 2] will arrange to deliver 2ea Transfer P/N T61589 to you until

weekend." CC-2 later wrote in a November 6, 2006 email to    mileasaviation@aol.com: "did you

receive 2 ea returning Transformer P/N T61589 from [CC-COMPANY 2 employee]?" Records

obtained from UPS show that MILES AVIATION was sent a UPS package from CC-COMPANY

2 on or about November 8, 2006, the airway bill of which listed "[CC-COMPANY] Pts. Return." In addition, based on a "first level" review, DDTC determined that this part falls on the USML.

18.    As noted above, on April 18, 2006, GEORGE MYLES, the president and owner of MILES AVIATION, was indicted in the Southern District of Florida for violating 18 U.S.C. § 38 ("aircraft parts fraud"). The Indictment charges that MYLES did "make materially fraudulent representations concerning aircraft parts . . . in that the defendant, as a supplier of aircraft parts to the U.S. Military and others, made false representations to purchasers regarding the condition of the parts." These distinct charges did not encompass any violations of the AECA, and MYLES was convicted of this offense in or about November 2006, was sentenced on March 9, 2007 to 78 months' incarceration, and is presently detained.   Notwithstanding these charges, MILES AVIATION has continued to export military items to CC-2 and CC-3. Moreover, CC-1, CC-2 and CC-3 have continued to try and obtain these materials from MILES AVIATION and other aviation parts suppliers. Indeed, notwithstanding the fact that GEORGE MYLES was recently detained after being sentenced, MILES AVIATION has apparently continued doing business and CC-2 has been in contact with DOUGLAS at gwendouglas@imonlinesales.com as recently as March 15, 2007.

19.    From my review of State filings and related documents, I have learned that MILES AVIATION was incorporated in the State of Florida on or about April 12, 2002, with GEORGE MYLES as its president. Its corporate address is listed as 2521 Northwest 16th Lane, Bay E, in Pompano Beach, Florida (the MILES AVIATION PREMISES).

20.    From my review of State filings and related documents, I have learned that EXTREME EYEWEAR was incorporated in the State of Florida on or about June 19, 2001, with

-24-

LAWRENCE DAVIS as its president. Its corporate address is listed as 2373 Southeast 14th Street, in Pompano Beach, Florida (the EXTREME EYEWEAR PREMISES).

21.    In or about April 2007, other law enforcement officials and I observed the MILES AVIATION PREMISES and EXTREME EYEWEAR PREMISES from outside the buildings.  On or about April 5, 2007, other law enforcement officials observed an automobile registered to GWENDOLYN DOUGLAS parked in the parking lot outside of the MILES AVIATION PREMISES.

## REQUEST TO SEARCH THE PREMISES

22.    Based on the foregoing, there is probable cause to believe that the THE PREMISES KNOWN AS (1) 2521 NORTHWEST 16 th LANE, BAY E, POMPANO BEACH, FLORIDA (the "MILES AVIATION PREMISES"), AND (2) 2373 SOUTHEAST 14th STREET, POMPANO BEACH, FLORIDA (the "EXTREME EYEWEAR PREMISES") , and any closed containers therein, contain evidence, instrumentalities and fruits of criminal activity, including:

(a)    Financial records, including but not limited to checks, wires, wire instructions and confirmations, journals, ledgers, faxes and/or fax machines and/or facsimile devices, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements, and correspondence relating thereto (including electronic mail);

(b)    Sales records, including but not limited to, requests for quotes, invoices, receipts, sales slips, certifications, including end user certifications, sales confirmations, bills of sale, purchase orders, and correspondence relating thereto (including electronic mail);

(c)    Export licensing records, including but not limited to, applications, submissions to Government entities, including but not limited to, requests for commodity

-25-

jurisdictions and any related records, receipts or prior licenses obtained and correspondence relating thereto (including electronic mail);

(d)    Shipping records, including but not limited to, packing lists, packing slips, letters of intent, airway bills, commercial invoices, shipper's export declarations, or any other valuations, hazardous material certifications, and bills, invoices and proof of payment or receipts from shipping carriers or freight forwarders and correspondence relating thereto (including electronic mail);

(e)    Travel records, and correspondence relating thereto (including electronic mail), evidencing travel to/from locations outside the United States and payment for such travel;

(f)    Photographs and digital image storage and processing devices relating to any of the subject matters described above;

(g)    Technical specifications and other materials relating to items to be exported, and correspondence relating thereto (including electronic mail);

(h)    Promotional materials, brochures, rates, licensing agreements, and other materials relating to the services provided by EXTREME EYEWEAR LLC, a/k/a Extreme Eyeware ("EXTREME EYEWEAR"), LAWRENCE DAVIS, a/k/a Larry Davis ("LAWRENCE DAVIS"), MILES AVIATION, Inc., a/k/a Myles Aviation, Inc. ("MILES AVIATION"), GEORGE MYLES, and GWENDOLYN DOUGLAS, a/k/a Gwen Douglas  ("GWENDOLYN DOUGLAS"), or any related entities, employees or individuals, and any correspondence relating thereto (including electronic mail);

(i)    Any written materials, videos, audio recordings, MP3 files and storage devices, correspondence (including electronic mail) and computer files relating to items to be exported,

-26-

intended to be exported or already exported by EXTREME EYEWEAR, LAWRENCE DAVIS,
MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related entities,
employees or individuals;

(j)    Any and all aviation parts that are or may be USML items or defense articles;

(k)    Computer records referring or relating to the information sought in sub-
paragraphs (a) through (j) above, including, but not limited to, computers; central processing units;
external and internal drives; external and internal storage equipment or media; terminals or video
display units; optical and CD scanners; computer software; computerized data storage devices,
including data stored on zip drives, handheld "flash" drives, palm pilots and/or other personal data
assistants, and any such device's power supply hardware; account names; passwords; encryption
codes; computer printouts or computer programs; computer or data processing software or data,
including CD-ROMs, hard disks, floppy disks, together with peripheral equipment such as
keyboards, printers, modems or acoustic couplers, and magnetic tapes which could contain or be
used to transmit or store records, documents, and materials relating to criminal activity by
EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and
GWENDOLYN DOUGLAS, or any related entities, employees or individuals and others. These
records include, but are not limited to, materials relating to the sale and/or export of aviation parts
that are or may be USML items or defense articles by EXTREME EYEWEAR, LAWRENCE
DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related
entities, employees or individuals.

Search/Seizure of Computers and/or Aviation Parts

23.     Based on my observations in the course of this investigation, there is probable cause to believe that EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related entities, employees or individuals and/or their business associates use computers in the course of criminal activity. Moreover, as described throughout this affidavit, there is probable cause to believe that EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related entities, employees or individuals and/or their business associates utilize aviation parts to violate export laws, and to conspire to violate those laws.  I therefore request permission to seize certain computer and aviation parts, including (a) input/output peripheral devices, keyboards, magnetic storage devices, routers and routing devices, related instructions in the form of manuals and notes, as well as the software utilized to operate any computers, and (b) aviation parts, that are or may be USML items or defense articles.

*Computers*

24.     Computer storage devices (such as hard disks, diskettes, compact disks, tapes, zip drives, handheld "flash" drives, etc.) can store the equivalent of thousands of pages of information.  In addition, a user may seek to conceal evidence of criminal activity by storing it in random order with deceptive file names.  Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending upon the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

-28-

25.    Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficiently specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive codes embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

26.    Due to the volume of the data at issue and the technical requirements set forth above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. It may be the case, however, under appropriate circumstances, that some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises.

27.    Computers recognized in the computer trade as personal "laptop" or "notebook" computers are often substantially smaller devices capable of being stored in a portable carrying case. While the storage capabilities of such devices vary, they are more often designed to facilitate usage by a single individual. Because of these characteristics, physical removal of personal laptop or notebook computers is usually the more practical alternative, and is often less intrusive then requiring federal agents to remain at the premises for the amount of time reasonably required

-29-

to review, analyze and copy pertinent data. Thus, a presumption exists that such computers will be seized and subsequently processed by a qualified computer specialist in a laboratory setting for reasons set forth above.

*Aviation Parts*

28.    Analyzing aviation parts for criminal evidence likewise requires expert skill. It is difficult to know prior to the search whether ICE's experts possess sufficient specialized skills to analyze the parts to determine if the items are, in fact, USML items or defense articles as defined by pertinent laws and regulations. Moreover, any analysis will need to follow protocols designed to protect the integrity of the evidence and requires analysis by the United States Department of State. For that reason, it may be necessary to seize certain aviation parts and transport them to a controlled environment pending analysis by a trained expert; leaving instrumentalities of criminal activity in the possession of EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS,  or any related entities, employees or individuals, at either the MILES AVIATION PREMISES or the EXTREME EYEWEAR PREMISES presents too great a risk of loss or destruction of evidence.

*Procedures*

29.    If, after inspecting the input/output peripheral devices, system software, pertinent computer related documentation, and any aviation parts, it becomes apparent that these items are no longer necessary to retrieve and preserve the evidence, such materials and/or parts will be returned within a reasonable time.

30.    The analysis of electronically stored computer data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different

techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

31. The Government therefore respectfully requests permission to, if necessary, remove any computer systems and aviation parts from THE PREMISES KNOWN AS (1) 2521 NORTHWEST 16th LANE, BAY E, POMPANO BEACH, FLORIDA (the "MILES AVIATION PREMISES"), AND (2) 2373 SOUTHEAST 14th STREET, POMPANO BEACH, FLORIDA (the "EXTREME EYEWEAR PREMISES"). The Government will endeavor to determine during the search whether the removal of some or all of the computer systems or aviation parts is necessary to retrieve relevant data. If it is necessary to remove the computer system or aviation parts, the data contained therein will be duplicated as quickly as possible and the seized system/aviation parts returned, if appropriate.

## CONCLUSION

32. For the foregoing reasons, there is probable cause to believe that THE PREMISES KNOWN AS (1) 2521 NORTHWEST 16th LANE, BAY E, POMPANO BEACH, FLORIDA (the "MILES AVIATION PREMISES"), AND (2) 2373 SOUTHEAST 14th STREET, POMPANO BEACH, FLORIDA (the "EXTREME EYEWEAR PREMISES"), contain evidence,

-31-

instrumentalities, and fruits of a crime, including violations of Title 22, United States Code, Section 2778, which makes it a crime to willfully export any defense articles listed on the United States Munitions List, Title 22, Code of Federal Regulations, Section 121.1, without a license for such export; conspiracy to commit this offense in violation of 18 U.S.C. § 371; and other laws.

WHEREFORE, I respectfully request that a search warrant be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure to search THE PREMISES KNOWN AS (1) 2521 NORTHWEST 16th LANE, BAY E, POMPANO BEACH, FLORIDA (the "MILES AVIATION PREMISES"), AND (2) 2373 SOUTHEAST 14th STREET, POMPANO BEACH, FLORIDA (the "EXTREME EYEWEAR PREMISES"), and to open any closed containers or other closed items found therein (including any safes or computers found on either premises) and to seize said items set forth in the Rider attached to this affidavit. I also respectfully request that this affidavit and related documents be filed under seal. The information to be seized is relevant to an ongoing investigation. Premature disclosure of the contents of the affidavit and related documents may jeopardize this continuing investigation.

SEAN WILLMAN
Senior Special Agent
United States Immigration and Customs Enforcement
United States Department of Homeland Security

Sworn to and subscribed before me
this 11th day of April, 2007.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

-32-

## ATTACHMENT A

**AS TO THE PREMISES KNOWN AS 2373 SOUTHEAST 14th STREET, POMPANO BEACH, FLORIDA, 33062 (the "EXTREME EYEWEAR PREMISES"),**

(a)     Financial records, including but not limited to checks, wires, wire instructions and confirmations, journals, ledgers, faxes and/or fax machines and/or facsimile devices, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements, and correspondence relating thereto (including electronic mail) from April 2002 to the present;

(b)     Sales records, including but not limited to, requests for quotes, invoices, receipts, sales slips, certifications, including end user certifications, sales confirmations, bills of sale, purchase orders, and correspondence relating thereto (including electronic mail) from April 2002 to the present;

(c)     Export licensing records, including but not limited to, applications, submissions to Government entities, including but not limited to, requests for commodity jurisdictions and any related records, receipts or prior licenses obtained and correspondence relating thereto (including electronic mail) from April 2002 to the present;

(d)     Shipping records, including but not limited to, packing lists, packing slips, letters of intent, airway bills, commercial invoices, shipper's export declarations, or any other valuations, hazardous material certifications, and bills, invoices and proof of payment or receipts from shipping carriers or freight forwarders and correspondence relating thereto (including electronic mail) from April 2002 to the present;

(e)     Travel records, and correspondence relating thereto (including electronic mail), evidencing travel to/from locations outside the United States and payment for such travel from April 2002 to the present;

(f)     Photographs and digital image storage and processing devices relating to any of the subject matters described above;

(g)     Technical specifications and other materials relating to items to be exported, and correspondence relating thereto (including electronic mail) from April 2002 to the present;

(h)     Promotional materials, brochures, rates, licensing agreements, and other materials relating to the services provided by EXTREME EYEWEAR LLC, a/k/a Extreme Eyeware ("EXTREME EYEWEAR"), LAWRENCE DAVIS, a/k/a Larry Davis ("LAWRENCE DAVIS"), MILES AVIATION, Inc., a/k/a Myles Aviation, Inc. ("MILES AVIATION"), GEORGE MYLES, and GWENDOLYN DOUGLAS a/k/a "Gwen Douglas" ("GWENDOLYN DOUGLAS") or any related entities, employees or individuals, and any correspondence relating thereto (including electronic mail) from April 2002 to the present;

ATTACHMENT A (cont.)

(i)    Any written materials, videos, audio recordings, MP3 files and storage devices, correspondence (including electronic mail) and computer files relating to items to be exported, intended to be exported or already exported by EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related entities, employees or individuals from April 2002 to the present;

(j)    Any and all aviation parts that are or may be USML items or defense articles;

(k)    Computer records referring or relating to the information sought in sub-paragraphs (a) through (j) above, including, but not limited to, computers; central processing units; external and internal drives; external and internal storage equipment or media; terminals or video display units; optical and CD scanners; computer software; computerized data storage devices, including data stored on zip drives, handheld "flash" drives, palm pilots and/or other personal data assistants, and any such device's power supply hardware; account names; passwords; encryption codes; computer printouts or computer programs; computer or data processing software or data, including CD-ROMs, hard disks, floppy disks, together with peripheral equipment such as keyboards, printers, modems or acoustic couplers, and magnetic tapes which could contain or be used to transmit or store records, documents, and materials relating to criminal activity by EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related entities, employees or individuals and others.  These records include, but are not limited to, materials relating to the sale and/or export of aviation parts that are or may be USML items or defense articles by EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS or any related entities, employees or individuals.

(l)    The search procedure for electronic data contained in computer operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, may include the following techniques:

1. The seizure of any computer or computer-related equipment or data, including floppy diskettes, fixed hard drives, or removable hard disk cartridges, software or memory in any form — which was accessible to or under the control of EXTREME EYEWEAR, LAWRENCE DAVIS, MILES AVIATION, GEORGE MYLES, and GWENDOLYN DOUGLAS and/or any related entites or employees of the entities — containing material described in sub-paragraphs (a)-(j), and the removal thereof from the PREMISES for analysis by authorized personnel;

2. Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

**ATTACHMENT A (cont.)**

3. "Opening" or cursorily reading the first few pages of such files in order to determine their precise contents;

4. "Scanning" storage areas to discover and possibly recover recently-deleted data;

5. Scanning storage areas for deliberately hidden files; or

6. Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.